*Ben Porto & Son, Ltd., et al. v. Montgomery County, Maryland*, No. 2183, September Term 2022.  Opinion by Getty, Joseph M., J.

**HEADNOTES:**

**STATUTORY CONSTRUCTION – DISTINCTION BETWEEN TAX AND REGULATORY FEE**

There is no set rule for determining when a legislative act constitutes a tax or a regulatory fee.  An act with the primary purpose of raising revenue is a tax, even if it is labeled by the legislature as a fee and has incidental regulatory effects.

**STATUTORY CONSTRUCTION – TAXES – DISTINCTION BETWEEN EXCISE TAX AND PROPERTY TAX**

An excise tax is a tax imposed upon the performance of an act, the engaging in an occupation, or the enjoyment of a privilege.  Conversely, a property tax is imposed by reason of ownership of property regardless of how that property is used.  When considering the distinction between an excise tax and a property tax, a court considers the label given by the legislature, the actual operation and practical effect of the tax, and the methods used to impose the tax.

**ENVIRONMENT – STORMWATER MANAGEMENT – STORMWATER REMEDIATION CHARGES**

The legislative history and statutory context of Sections 4-202.1 and 4-204 of the Environment Article of the Maryland Code (1996, 2013 Repl. Vol., 2023 Supp.) require a county or municipality with stormwater remediation charges to abide by the requirements of State law, regardless of whether the county or municipality authorizes its stormwater remediation charges under its general taxing authority.

**ENVIRONMENT – STORMWATER MANAGEMENT – EXEMPTION FROM STORMWATER REMEDIATION CHARGES**

Section 4-202.1(e)(2)(ii) of the Environment Article of the Maryland Code (1996, 2013 Repl. Vol., 2023 Supp.) does not exempt all property covered by a National Pollutant Discharge Elimination System permit from county/municipal stormwater remediation charges.  Rather, it exempts only property owned by the State or State government and property covered by a municipal separate storm sewer system permit or industrial stormwater permit held by a State entity.  Further, a party that claims exemption from stormwater remediation charges because the Water Management Administration of the Maryland Department of the Environment has determined that a land use activity is regulated under specific State laws, COMAR Section 26.17.02.05.B, must demonstrate that

the Water Management Administration has actually made such a determination. A showing that a land use activity is regulated in general is insufficient to claim an exemption in the absence of a determination from the Water Management Administration.

**STATUTORY CONSTRUCTION – OVERLAP OF STORMWATER MANAGEMENT AND SEDIMENT AND EROSION CONTROL**

The Montgomery County Code does not require that a property strictly comply with the stormwater management practices set forth in the 2000 Maryland Stormwater Design Manual in order to be eligible for a credit against the County's stormwater remediation charge. A property owner is eligible for such a credit if they can demonstrate acceptable treatment of stormwater, even if the management practice was originally put in place to meet sediment and erosion control requirements.

REPORTED

IN THE APPELLATE COURT

OF MARYLAND

No. 2183

September Term, 2022

_____

BEN PORTO & SON, LTD., ET AL.

v.

MONTGOMERY COUNTY, MARYLAND

_____

Berger,
Leahy,
Getty, Joseph M.
    (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Getty, J.

_____

Filed: July 9, 2024

*Tang, Rosalyn, J., did not participate in the Court's decision to designate this opinion for publication pursuant to Md. Rule 8-605.1.

Pursuant to the Maryland Uniform Electronic Legal Materials Act (§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Gregory Hilton, Clerk

This case is a continuation of an eight-year legal odyssey pursued by Ben Porto & Son, Ltd., and Tri-State Stone & Building Supply, Inc. (collectively, "Porto"). Ben Porto & Son owns three contiguous parcels (the "Porto property") in Montgomery County, Maryland, on which Tri-State Stone & Building Supply operates a quarry and building supply business. Since 2016, Porto has opposed Montgomery County's imposition of the Water Quality Protection Charge ("WQPC") on the impervious surfaces on Porto's property.

The WQPC is Montgomery County's stormwater remediation charge, imposed by the County to control the negative effects of increased stormwater runoff from developed and developing lands. Subject to certain exceptions, Montgomery County charges set rates against each property owner in the county based upon the amount of impervious surface on their property. A property owner who can demonstrate that they treat their stormwater on-site can apply for a credit against the WQPC.

For each year between 2016 and 2018, Porto filed applications and appeals for either an exemption from or credit against the WQPC for its quarry. Montgomery County (the "County") denied each application, concluding that Porto was neither legally exempt from nor entitled to a credit against the WQPC. Porto ultimately appealed the County's denial to the Maryland Tax Court (the "Tax Court"), again arguing either exemption from the WQPC entirely or entitlement to a credit for its purported on-site treatment of stormwater. After a trial in which both Porto and the County presented witness testimony, the Tax Court denied Porto's request for exemption from the WQPC but found that Porto had demonstrated that it treated all of its stormwater on-site while also providing treatment for

off-site stormwater.  Because of that finding, the Tax Court awarded a 100% credit to Porto against the WQPC.

The parties then sought judicial review in the Circuit Court for Montgomery County. Porto reiterated its exemption argument, and the County challenged the Tax Court's grant of a 100% credit.  The circuit court ultimately affirmed the Tax Court's decision as it related to exemption and entitlement to credit but remanded to the Tax Court because neither the record nor the Tax Court's order reflected how the 100% credit award was calculated.  The parties cross-appealed to this Court on the same issues.

We have rephrased and reorganized the questions presented[1] as follows:

---

[1] Porto's questions presented are:

1. Is Montgomery County's [WQPC] an unconstitutional retroactive excise tax of a vested right, *i.e.,* taxation of Appellants' impervious surface already in place long before the promulgation of the WQPC?

2. Did the County fail to follow the Maryland Environmental Code section 4-204(e)(1)'s provision that "this subsection applies to a system of charges established by Montgomery County under subsection (d) of this section," which states that "stormwater management . . . charges shall be assessed in a manner consistent with § 4-202.1(e)(3) . . . of this subtitle" mandating that the "stormwater remediation fee . . . [shall be] based on the share of stormwater management services related to the property and provided by the county or municipality," where the County's WQPC bears no relation to the stormwater management services the County provides to Appellants and basically provides no stormwater management service to Appellants?

3. Do the Maryland Environmental Code and Montgomery County Code require exemption from the WQPC for Appellants' properties?

4. Does the extensive State regulation of mines preempt the County's WQPC law with respect to permitted and licensed mines like Appellants'?

(continued . . .)

2

1. Is the WQPC an unconstitutional retroactive excise tax?

2. Did the County improperly impose the WQPC against Porto?

3. Did the Tax Court err in its award and calculation of Porto's WQPC credit?

4. Did the circuit court and Tax Court err by refusing to award attorneys' fees to Porto?

---

5. Did the Maryland Tax Court err in not granting Appellants' attorney's fees for the County maintaining and defending its erroneous decisions without substantial justification and causing Appellants needless expenditures of resources to enforce its rights under law?

In its cross-appeal, the County presents the following questions and rephrases Porto's questions:

1. Did the Tax Court err as a matter of law in concluding that properties with erosion and sediment controls rather than a statutorily defined stormwater management system that treats on-site drainage were entitled to a WQPC credit?

2. Did the Tax Court err as a matter of law and for failure to establish necessary facts—as the Circuit Court concluded—by awarding the maximum WQPC credit without any factual determination in accordance with the statutory and regulatory framework for the calculation of such credits?

3. Did the Circuit Court (and Tax Court, implicitly) err as a matter of law in concluding that the WQPC is a valid exercise of the County's excise tax authority and not a fee subject to possible preemption by State mining laws?

4. Did the Circuit Court err as a matter of law in concluding that the imposition of the WQPC is not an unconstitutional retroactive excise tax?

5. Did the Circuit Court (and Tax Court, implicitly) err as a matter of law in concluding that Appellants' properties are not exempt from imposition of the WQPC?

6. Did the Tax Court and Circuit Court err as a matter of law in concluding that there was no basis in law to award attorneys' fees to Porto?

3

For the reasons set forth below, we conclude that the WQPC is a valid excise tax but do not reach the question of whether it is unconstitutionally retroactive, as that issue was not preserved for our review. Further, we hold that the WQPC can be imposed against Porto but that based upon the Tax Court's factual findings, Porto is entitled to a credit against the WQPC. However, the Tax Court's order did not demonstrate how it calculated the credit amount Porto was entitled to. Finally, attorneys' fees are not available in this case. Accordingly, we affirm the decision of the Circuit Court for Montgomery County remanding the case to the Tax Court for further fact-finding on the record to show the calculations required by County law for determining the amount of credit Porto should be awarded.

## BACKGROUND

### A. Federal and State Water Quality Protection

#### 1. Federal Clean Water Act

The United States Congress passed the Federal Water Pollution Control Act of 1972, 33 U.S.C. §§ 1251–1389 (2016), more commonly known as the Clean Water Act (the "CWA"), to address growing concerns surrounding water pollution in the nation's waters. *Shaarei Tfiloh Congregation v. Mayor & City Council of Balt.*, 237 Md. App. 102, 110 (2018). The CWA takes a "cooperative federalism" regulatory approach to stemming water pollution, such that federal, state, and local governments are involved in the regulatory process. *Md. Dep't of Env't v. Cnty. Comm'rs of Carroll Cnty.*, 465 Md. 169, 182 (2019). Each state must establish water quality standards for covered waters within

4

the state's borders.  *Piney Run Pres. Ass'n v. Cnty. Comm'rs of Carroll Cnty.*, 268 F.3d 255, 260 (4th Cir. 2001).

The basic premise of the CWA is that the discharge of pollutants into water bodies is illegal.  *Md. Dep't of Env't v. Anacostia Riverkeeper*, 447 Md. 88, 96 (2016).  In order for an entity to discharge pollutants into waters covered by the CWA, the entity must obtain a permit from the federal Environmental Protection Agency or an authorized state agency.  *Piney Run*, 268 F.3d at 260.  Known as National Pollutant Discharge Elimination System ("NPDES") permits, these permits allow the permitholder to discharge within set limits on the type and quantity of pollutants covered by the permit (the "effluent limitations").  *Anacostia Riverkeeper*, 447 Md. at 96.  Before issuing a NPDES permit, the reviewing agency must ensure that the prospective discharger will not violate the water quality standards set by the state where the discharge will occur.  *Piney Run*, 268 F.3d at 260.

Federal law allows for two types of NPDES permits: individual and general permits.  As its name suggests, an individual permit covers an individual discharger.  *Driscoll v. Adams*, 181 F.3d 1285, 1288 (11th Cir. 1999).  Each individual permit contains its own effluent limitations for the permitted entity.  U.S.C. § 1342(a).  Conversely, a general permit "authoriz[es] a category of discharges under the CWA within a geographical area."  40 C.F.R. § 122.2 (2022); *see also* Md. Code Regs. ("COMAR") 26.08.01.01(35) ("'General permit' is a discharge permit issued to a class of dischargers.").  "[A] general permit is established with set limits and requirements."  *Anacostia Riverkeeper*, 447 Md. at 138 n.57.  To be covered by a general permit, the potential discharger "file[s] a notice of intent . . . through which the discharger agrees to discharge under the terms of the general

5

permit." *Id.* The notice of intent "represents no more than a formal acceptance of terms elaborated elsewhere." *Id.* (quoting *Env't Def. Ctr. v. EPA*, 344 F.3d 832, 853 (9th Cir. 2003)).

## 2. Stormwater Management in Maryland

Title 9, Subtitle 3 of the Environment Article ("EN") of the Maryland Code (1996, 2014 Repl. Vol.) contains Maryland's laws on water pollution control, and Sections 9-322 through 9-333 govern discharge permits. The Maryland Department of the Environment ("MDE") is the agency authorized to issue NPDES permits in the State. *Piney Run*, 268 F.3d at 260; COMAR 26.08.04.07. In accordance with the authorization in federal law, MDE issues general permits for certain classes of discharges, including for stormwater discharges and discharges from specified industries. COMAR 26.08.04.08B(2)(a), 26.08.04.09.

Title 4 of the Environment Article ("Water Management") contains additional provisions regarding activities that affect water. Md. Code (1996, 2013 Repl. Vol., 2023 Supp.), EN §§ 4-101–901. These provisions include, *inter alia*, sediment control, stormwater management, watershed sediment and waste control, and pollution control and abatement.

## a. Maryland Stormwater Management Act

Subtitle 2 of Title 4 ("Stormwater Management") contains the Maryland Stormwater Management Act. EN §§ 4-201–215; *Carroll Cnty.*, 465 Md. at 196. First enacted in 1982, Subtitle 2 was created "to reduce as nearly as possible the adverse effects of stormwater runoff." *Anacostia Riverkeeper*, 447 Md. at 111 (quoting EN § 4-201).

6

Under the Subtitle, each county and municipality in the State was required to "'adopt ordinances necessary to implement a stormwater management program' by July 1, 1984," and the Department of Natural Resources was to issue regulations establishing minimum control requirements and design criteria for those programs. *Id.* (quoting EN § 4-202).

In 1987, MDE replaced the Department of Natural Resources as the agency promulgating regulations on stormwater management programs. *Id.* at 111 n.30. By 2000, MDE had identified "programmatic shortcomings" of the existing regulations. *Id.* at 111 (quoting 27 Md. Reg. 1167, 1168 (June 16, 2000) (to be codified at COMAR 26.07.02)). To rectify the "sparse guidance" in the regulations, MDE promulgated new regulations, including incorporating by reference the 2000 Maryland Stormwater Design Manual (the "Design Manual"). *Id.* at 111–12 (quoting 27 Md. Reg. 1167, 1168). Each county and municipality were in turn required to incorporate the Design Manual into their own policies. *Id.* at 112. In 2007, the General Assembly mandated the use of environmental site design ("ESD"). *Id.* "ESD is best understood as those practices, such as 'small-scale stormwater management practices, nonstructural techniques, and better site planning,' that 'mimic natural hydrologic runoff characteristics and minimize the impact of land development on water resources.'" *Id.* (quoting EN § 4-201.1(b)).

As initially passed in 1982, the Stormwater Protection Act authorized counties and municipalities to "impose and collect stormwater remediation fees and other charges" to carry out the programs required by the law. *Carroll Cnty.*, 465 Md. at 196–97. Specifically, the law stated: "Each county or municipality may adopt a fee system to cover the cost of reviewing stormwater management plans and implementing stormwater

7

management programs." 1982 Md. Laws ch. 682. The General Assembly altered this language in 1992 to read: "Each governing body of a county or municipality may adopt a *system of charges* to fund the implementation of stormwater management programs . . . ." 1992 Md. Laws ch. 135 (emphasis added). In 2006, the Maryland Attorney General advised Anne Arundel County officials that the law's "system of charges" language likely allowed jurisdictions to impose charges through a regulatory fee, a tax, or a combination thereof. 91 Md. Atty. Gen. Op. 152, 163 (2006). This authorization for a system of charges is found in Section 4-204(d) of the Environment Article.

In 2012, the General Assembly again amended the provisions governing local stormwater management programs and associated fees, creating Section 4-202.1 of the Environment Article. 2012 Md. Laws ch. 151. The new law required the ten largest jurisdictions in Maryland[2] to establish "a watershed protection and restoration program" that includes a "stormwater remediation fee" and a "local watershed protection and restoration fund." *Id.* In setting a stormwater remediation fee, a jurisdiction was allowed to premise the fee based on a flat rate, "an amount that is graduated, based on the amount of impervious surface on each property," or another method selected by the jurisdiction. *Id.* However, the law provided an exemption for jurisdictions that had already "enacted and implemented a system of charges under § 4-204 of this subtitle for the purpose of

---

[2] The unifying element of the jurisdictions subject to the new law was not their size per se but the fact that they were all subject to a NPDES Phase I municipal separate storm sewer system permit. 2012 Md. Laws ch. 151; *Shaarei Tfiloh*, 237 Md. App. at 112–13. However, the phases for the applicable permits were largely determined by size of jurisdiction, such that Phase I jurisdictions were those with over 100,000 inhabitants. *Shaarei Tfiloh*, 237 Md. App. at 111–12.

funding a watershed protection and restoration program, or similar program, in a manner consistent with the requirements of this section." *Id.* (codified at EN § 4-202.1).

Section 4-202.1 was again amended in 2015. 2015 Md. Laws ch. 124. With this change, the General Assembly removed the requirement that Phase I jurisdictions enact a stormwater remediation fee to support stormwater management programs and funds, so long as the jurisdiction provided other sources of revenue for those programs and funds. *Id.* Further, Chapter 124 provided that, subject to certain exceptions, stormwater remediation fees could not be applied against "property owned by the State or a unit of State government" or property owned by a tax-exempt veterans' organization or a regularly organized volunteer fire department. *Id.*

The interplay between Section 4-202.1 and Section 4-204 is of particular importance in this case. Section 4-202.1(a)(2) states:

> This section does not apply to a county or municipality that, on or before July 1, 2012, has enacted and implemented a system of charges under § 4-204 of this subtitle for the purpose of funding a watershed protection and restoration program, or similar program, in a manner consistent with the requirements of this section.[3]

An additional exemption for Montgomery County was added with the 2015 changes to the section, stating simply that "[e]xcept as provided in subjection (j) of this section, this section does not apply in Montgomery County." 2015 Md. Laws ch. 124; EN §

---

[3] The Fiscal and Policy Note for House Bill 987, which became Chapter 151 and created EN Section 4-202.1, stated that Legislative Services was aware of seven jurisdictions that already had programs to raise revenue for stormwater management: Charles, Montgomery, and Prince George's counties, and Annapolis, Frederick, Rockville, and Takoma Park. Dep't of Legis. Servs., Fiscal & Policy Note, H.B. 987, at 7 (2012).

4-202.1(a)(3). The County, however, is still subject to most of the substantive provisions of Section 4-202.1; the provisions added to Section 4-202.1 in 2015 prohibiting the application of remediation fees against certain property were added to Section 4-204 via a provision applying only to Montgomery County. 2015 Md. Laws ch. 124; EN § 4-204(e). Additionally, Section 4-204(d)(4) requires that any charges established under that section "be assessed in a manner consistent with § 4-202.1(e)(3) and (f) of this subtitle." Section 4-202.1(e)(3) provides in full:

> (3)(i) If a county or municipality establishes a stormwater remediation fee under this section, a county or municipality shall set a stormwater remediation fee for property in an amount that is based on the share of stormwater management services related to the property and provided by the county or municipality.
> (ii) A county or municipality may set a stormwater remediation fee under this paragraph based on:
>   1. A flat rate;
>   2. An amount that is graduated, based on the amount of impervious surface on each property; or
>   3. Another method of calculation selected by the county or municipality.

Section 4-202.1(f) requires a jurisdiction with a stormwater remediation fee to establish policies allowing for the reduction of the fee if stormwater is treated by the property owner.

### b. Montgomery County's WQPC

Montgomery County enacted its WQPC in 2001 pursuant to the authorization of Section 4-204 of the Environment Article. 2001 Laws of Montgomery Cnty. ("L.M.C.") ch. 27. The original version of Section 19-35(a) of the Montgomery County Code ("County Code" or "MCC") read as follows:

> As authorized by state law (Maryland Code, Environment Art., §4-204), the Director of Finance must annually impose and collect a Water Quality Protection Charge, as provided in this Section. The Director must collect the

> Charge in the same manner as County real property taxes, apply the same interest, penalties, and other remedies (including tax sale) if the Charge is not paid, and generally treat the Charge for collection and administration purposes as if it were a County real property tax. The Director may treat any unpaid Charge as a lien on the property to which the charge applies.

2001 L.M.C. ch. 27. The law authorized the County Executive to adopt regulations to administer the WQPC. *Id.* Initially, the WQPC applied only to residential property and associated non-residential property. *Id.*

When the General Assembly changed the provisions governing stormwater remediation fees in 2012, the Montgomery County Council (the "County Council" or "Council") amended Section 19-35 to bring the WQPC into compliance with the changes. Dep't of Legis. Servs., Revised Fiscal & Policy Note, S.B. 863, at 7 (2015); 2013 L.M.C. ch 11. This included expanding the application of the WQPC to include all property not otherwise exempt under State law and creating provisions allowing for credits against the WQPC. 2013 L.M.C. ch. 11.

At the time it was originally enacted, the County did not specify the precise mechanism by which the WQPC was administered. In 2015, the owner of a commercial development challenged the WQPC, alleging that it was both invalid per se and as applied to the property because the County was charging the WQPC without reasonable relation to the stormwater services provided by the County as required by Section 4-202.1(e)(3)(i). *Chod v. Bd. of Appeals for Montgomery Cnty.*, No. 398704-V (July 22, 2015). Ultimately, the Circuit Court for Montgomery County agreed with the property owner, finding that although the County was following a statutorily-approved method of calculating the WQPC—the amount of impervious surface on the property—the County was not charging

the WQPC "based on the share of stormwater management services related to the property and provided by the county or municipality." *Id.* at 6 (quoting EN § 4-202.1(e)(3)(i)). The court found that the WQPC was invalid both on its face and as applied to the development. *Id.* at 5, 7.

In response to the *Chod* decision, the County Council made the WQPC an excise tax.[4] 2015 L.M.C. ch. 54. Section 19-35(a) of the County Code now states: "As authorized by Section 52-17(a) [of the MCC] or Maryland Code, Environment Art., § 4-204, or both, the Director of Finance must annually impose and collect a Water Quality Protection Charge, as provided in this Section." Section 52-17(a) of the County Code contains the County's taxing authority, vesting in the Council "the power to tax to the same extent as the state has or could exercise said power within the limits of the County as a part of its general taxing power." Additionally, the 2015 change to the County Code provided a definition for the WQPC for the first time: "An excise tax charged to a property owner for the privilege of maintaining impervious surfaces on the owner's property." 2015 L.M.C. ch. 54; MCC § 19-21. The WQPC is also now further defined by current regulation as

> an excise tax levied by the Director of Finance to cover the cost of constructing, operating, and maintaining facilities within the County's stormwater management system and fund related expenses allowed under applicable state law based on the impact of stormwater runoff from the impervious areas of developed land in the County.

Montgomery County Code of Regulations ("COMCOR") 19.35.01.02.

---

[4] As will be explained further below, an excise tax is generally defined as a "tax imposed on the manufacture, sale, or use of goods (such as a cigarette tax), or on an occupation or activity (such as a license tax or an attorney occupation fee)." Black's Law Dictionary (11th ed. 2019).

The current version of MCC Section 19-35(f) provides that the revenue collected from the WQPC must be deposited into a stormwater management fund that can be used for "construction, operation, financing, and maintenance of stormwater management facilities" and associated costs, enforcement and administration of the stormwater management provisions of the County Code, and "any other activity authorized by this Article or state law."

Section 19-35(e) further allows for a property owner to apply to the Director of Environmental Protection for a credit against the WQPC if: (1) the property contains a stormwater management system that the County does not maintain which treats on-site runoff or on-site runoff and off-site runoff from properties in the same drainage area; (2) the property does not have its own stormwater management system but is within the same drainage area as a property that does and both properties have the same owner; (3) "the property contains a stormwater management system built as part of a County-approved stormwater management participation project"; or (4) the property does not have its own County-approved stormwater management participation project but is in the same drainage area as a property that does and both properties have the same owner. By regulation, the County allows for a maximum award of 60% credit "based on the proportion of the total volume of water treatment provided by the stormwater management system relative to the [ESD] storage volume required under State law as specified in the Water Quality Protection Charge Credit Procedures Manual" published by the County and the volume of treatment is premised on the ESD specifications in the Design Manual. COMCOR 19.35.01.05B(1). A nonresidential or multifamily residential property can apply for a maximum award of a

100% credit if the property's stormwater management system treats its on-site stormwater and provides "additional storage volume for off-site drainage." COMCOR 19.35.01.05B(2). At the times relevant in this case, the County did not provide a definition of "treatment."

### B. Procedural History

#### 1. The Porto Quarry

The Porto mine is a dimension stone[5] quarry located in Bethesda, Maryland, in Montgomery County, and it is one of only a few quarries remaining in the County. It mines a rare stone that is "the area's only indigenous quartzite stone." In 1977, the County designated the Porto quarry as an "Area of Critical State Concern" because it was found to be "in the State's interest to preserve [mineral deposits] that contain useful material so that future generations may be able to take advantage of readily accessible economic sources of building material." As Porto clarified in its requests for WQPC credit, Porto owns the real property, while Tri-State Stone & Building Supply, Inc., operates the quarry and building supply business on the property. The Porto property consists of three parcels.

Like other surface mines in the State, Porto holds a mining license and a surface mining permit, both issued by MDE, as well as a sediment control permit issued by the County. Md. Code, EN §§ 15-807–808; MCC § 19-2. Porto is covered by Maryland's

---

[5] "Dimension stone can be defined as natural rock material quarried for the purpose of obtaining blocks or slabs that meet specifications as to size (width, length, and thickness) and shape." Nat'l Mins. Info. Ctr., *Dimension Stone Statistics and Information*, U.S. Geological Surv. (accessed Mar. 12, 2024), https://www.usgs.gov/centers/national-minerals-information-center/dimension-stone-statistics-and-information [https://perma.cc/86XZ-CV2E].

NPDES General Discharge Permit for Discharge from Mineral Mines, Quarries, Borrow Pits, and Concrete and Asphalt Plants ("15MM permit").[6]

### 2. *Porto and the Montgomery County WQPC*

The County has charged Porto for the WQPC annually since 2012, when the WQPC was expanded from only residential property to all property in the County. In tax years 2016, 2017, and 2018, Porto submitted a WQPC credit application and appeal to the County's Department of Environmental Protection ("DEP").[7] Each of the applications and appeals contained the same arguments regarding why Porto believed it was either exempt from the WQPC or entitled to a 100% credit against the WQPC. These arguments were: (1) the County failed to consider Porto's unique position as a "licensed, permitted, specifically and highly-regulated" quarry when implementing the WQPC program; (2) Porto is exempt from stormwater management requirements because State mining law regulates mine stormwater; (3) Porto is entitled to special treatment as an area of critical concern and through existing settlement agreements with the County; (4) the berm[8] Porto installed on its property entitles it to a 100% credit; (5) the WQPC favors property owners in high-density areas while penalizing those in low-density areas; (6) "the WQPC is

---

[6] The 15MM permit expired on April 30, 2022, but was administratively extended by MDE while a new general permit is being approved.

[7] Porto filed each of its Credit Applications and Appeals contemporaneously.

[8] The Design Manual defines a berm as "[a] shelf that breaks the continuity of a slope; a linear embankment or dike." Water Mgmt. Admin, Md. Dep't of Env't, Maryland Stormwater Design Manual G.1 (2000, rev. 2009).

disproportionately applied to non-residential, non-agricultural property owners like Porto";

and (7) the WQPC is a tax on a pre-existing legal use and contravenes zoning and land use

policy.

In 2017, DEP requested that Porto send additional information about the specific

stormwater management systems on Porto's property, which Porto did not provide. DEP

then denied Porto's applications and appeals for 2016 and 2017 on November 21, 2017.

The denial explained that, without the additional information requested, DEP could not

determine whether Porto was entitled to either WQPC credit or exemption. DEP further

explained that Porto's purported water quality improvements only satisfied its sediment

control obligations under the 15MM and sediment control permits and did not meet the

requirements for a WQPC credit, nor did Porto's unique history and business qualify it for

exemption.

Porto requested that DEP reconsider the denial.[9] Porto reiterated its belief that it

was exempt from the WQPC and other County stormwater management requirements and

also argued that the denial letter improperly equated the quarry to commercial or industrial

land uses when it should be likened to agricultural uses.

---

[9] On December 7, 2017, two days before it sent its request for reconsideration to DEP, Porto filed a complaint in the Circuit Court for Montgomery County against the County seeking declaratory judgment, writ of mandamus, and injunctive relief, alleging that the County was failing to abide by State and County law by imposing the WQPC against Porto. Porto's 2017 challenge ultimately resulted in an unreported decision from this Court holding that Porto failed to exhaust its administrative remedies by filing its complaint in the circuit court without first bringing its complaint to the Maryland Tax Court. *Ben Porto & Son, Ltd. v. Montgomery Cnty.*, No. 894, Sept. Term, 2018, 2020 WL 1950501 (Md. App. Ct. Apr. 23, 2020).

DEP responded on January 8, 2018, again concluding that Porto was not entitled to exemption or credit. The January 8 denial letter explained DEP's reasons in more detail, categorizing Porto's arguments into three general positions: (1) Porto is exempt from the WQPC by State and County law; (2) Porto should be granted a WQPC credit; and (3) Porto's unique situation should be considered in applying the WQPC to it. As to the first category, DEP explained that the exemption provisions in State and County law that Porto relied on do not apply to quarries. DEP also stated that, because the WQPC is not regulatory, the fact that Porto is regulated by the State does not prevent the County from charging the WQPC against Porto. Regarding the second category, DEP explained, as it did in the initial denial, that Porto's purported stormwater management systems are not entitled to credit because they do not align with the Design Manual and the State's municipal separate storm sewer system ("MS4") guidance. Finally, DEP stated that it cannot view Porto differently from any other privately-owned property containing impervious surfaces.

Porto appealed DEP's January 8 denial to the County Director of Finance as allowed under MCC 19-35(i).[10] The Finance Director affirmed DEP's denial, determining that:

1) The County is authorized to impose the WQPC under its general taxing authority pursuant to MCC, Section 52-17,

_____

[10] As explained in the County's brief, Porto originally appealed DEP's denial to the County Board of Appeals, which was the statutory appeal procedure in effect at the time. While it was pending, a separate case before this Court concluded that DEP denial of credits needed to be appealed to the County Finance Director, then to the Tax Court if necessary. *Bd. of Appeals for Montgomery Cnty. v. Battley*, No. 448, Sept. Term, 2017, 2018 WL 3492823 (Md. App. Ct. July 20, 2018). Once the new procedure was in place, Porto redirected its appeal to the Finance Director.

17

2) State mining law does not preempt the County from imposing and collecting the WQPC because it is a general excise tax and not regulatory in nature,

3) Porto is not exempt from the WQPC under MCC, Section 19-31(d),

4) Porto is not exempt from the WQPC under the Code of Maryland Regulations (COMAR), Section 26.17.02.05, and

5) The County is unable to grant Porto any credits under its "agricultural property" theory because it operates a dimensional stone quarry, and the State Department of Assessments and Taxation (SDAT) has not classified the quarry as an agricultural property.

3. *Appeal to the Tax Court*

Porto appealed the Finance Director's decision to the Maryland Tax Court. As relevant here, Porto argued in its pretrial brief[11] before the Tax Court that: (1) it is exempt from the WQPC under EN Section 4-202.1(e)(2)(ii)(2) and MCC Section 19-31; (2) State and federal law preempt the WQPC because the WQPC is regulatory and duplicates processes and requirements imposed by the State and federal government; (3) the WQPC was incorrectly applied to Porto because the County did not properly consider Porto's stormwater management and because the County provides no meaningful stormwater services to Porto; and (4) the WQPC is a property tax, not an excise tax, and is therefore unconstitutional for lack of uniformity. Porto also requested that it be awarded attorneys' fees and other costs, alleging that it was entitled to "reimbursement for the funds it expended rectifying the County's errors in promulgating and levying the WQPC . . . and the funds [Porto] expended due to the change of the appeals process during the pendency of this litigation."

---

[11] Porto's amended petition to the Tax Court listed 27 questions that "demonstrate how [the County's] actions taken against Porto were illegal and erroneous."

18

In response, the County argued that: (1) State and County law exempt specific private property from the WQPC but do not exempt quarries, and EN Section 4-202.1(e)(2)(ii)(2) applies only to State government entities; (2) as a tax, the WQPC cannot be preempted by regulatory schemes; (3) the required relationship between the WQPC and the services rendered by the County under EN Section 4-202.1(e)(3) is satisfied through services given to the general public; and (4) the WQPC is a valid excise tax, as demonstrated by the decision in *Shaarei Tfiloh*.

The Tax Court held a trial on March 24, 2021. At the trial, the parties largely reiterated their arguments from the pretrial briefs. Porto called Matthew Ernest ("Mr. Ernest"), a civil engineer, as an expert witness who testified about the attributes of Porto's property that he believed qualified as stormwater treatment systems eligible for WQPC credit. In his testimony about those systems, Mr. Ernest highlighted the similarities between stormwater management systems and sediment control systems and stated that in his professional opinion, the sediment control systems on Porto's properties were equivalent to WQPC credit-eligible stormwater management systems because they treat stormwater in addition to reducing erosion. Further, Mr. Ernest noted that the Porto property is in a constant state of flux due to the nature of the quarry and stated that he believed many of the stormwater management systems specified in the Design Manual would be inappropriate for the Porto property.

The County called Vicky Wan ("Ms. Wan"), the division chief for the Strategic Services Division of DEP, which oversees the WQPC, as a witness. Ms. Wan explained

how DEP implements the WQPC, including the credit program, and testified as to a site visit she made to Porto's property to see the extent of impervious surfaces on the property.

The Tax Court issued its order on August 24, 2021. "After consideration of the testimony and evidence presented at trial [and] the arguments and briefs of the parties," the Tax Court concluded that Porto had "demonstrated both onsite treatment of all of its stormwater and additional treatment of offsite stormwater and [was] thus entitled to [WQPC] credit." The Tax Court made a factual finding that, based upon Mr. Ernest's uncontroverted testimony, Porto's property contained stormwater treatment mechanisms, including "an enormous excavated quarry pit with two (2) wet ponds, swales, culverts, berms, filtered traps and areas that act like dry ponds," as well as "a large berm [that] was built to prevent flooding and erosion." As a result, the Tax Court determined that

> stormwater was treated based on the properties' development with a changing final impervious area. Consequently, the County Design Manual recommendations could not apply from an engineering standpoint. The stormwater treatment practices comply with best management practices as well as the Clean Water Act. Therefore, [Porto] ha[s] substantially complied with the requirements of the Montgomery County Regulations and [is] entitled to a 100% Water Quality Protection Charge credit.

The Tax Court ordered that Porto receive a 100% credit for tax years 2016, 2017, and 2018. As to Porto's request for attorneys' fees, the Tax Court concluded that there is no statutory authority authorizing the grant of such fees in an appeal before the Tax Court.

### 4. *Appeal to the Circuit Court*

The County and Porto both sought judicial review of the Tax Court's decision in the Circuit Court for Montgomery County.[12] The County identified two areas of error in the Tax Court's order. First, the County asserted that the Tax Court conflated stormwater management law and sediment and erosion control law, which are two distinct areas of law, and that it "ignor[ed] the express statutory requirements to receive credits against the WQPC as explicitly set forth in the stormwater management laws." Second, the County argued that the Tax Court erred by determining itself that Porto was entitled to a 100% credit and that it should have instead ordered the County to calculate Porto's credit entitlement in accordance with County procedures.

Porto appealed the Tax Court's decision on the denial of exemption and of attorneys' fees and the failure to rule on the other issues presented. Specifically, Porto asserted that the Tax Court failed to follow statutory language that exempts mines like Porto from the WQPC, that the WQPC is a retroactive excise tax on a vested right because it taxes impervious surfaces that existed before the tax was promulgated, and that contrary to the County's classification, the WQPC is either a property tax or a regulatory fee, neither of which can be imposed upon Porto. Further, Porto argued that the County had engaged in bad faith and lacked substantial justification in pursuing its positions in litigation and in its other dealings with Porto, such that Porto was entitled to attorneys' fees under Maryland Rule 1-341. In response to the County's arguments to the circuit court, Porto averred that

---

[12] The two appeals were consolidated by the circuit court.

the Tax Court properly considered the uncontroverted evidence presented to it and correctly concluded that the evidence showed that Porto was eligible for a 100% credit against the WQPC.

The circuit court held a hearing in the appeal on July 14, 2022, and took the case under advisement to consider the issues and cross-appeals more closely. On January 19, 2023, the court made an oral ruling that affirmed the findings of the Tax Court and the conclusion that Porto was entitled to a WQPC credit but remanded the case to the Tax Court for further findings regarding the amount of the credit. The court explained that the record did show that Porto treats its stormwater onsite and is thus entitled to some WQPC credit. However, the court found that the record did not support the Tax Court's conclusion that Porto was entitled to a 100% credit because the Tax Court's order did not explain how it reached that conclusion or demonstrate how the statutory and regulatory considerations for calculating credits were followed. The court also affirmed the Tax Court's conclusion that Porto does not qualify for an exemption from the WQPC under the County Code and the denial of attorneys' fees.

The court and the parties returned on February 27, 2023, when the court made additional rulings affirming the Tax Court's "implicit" rulings that the WQPC is a valid excise tax within the County's authority, as well as the determination that State mining regulation does not preempt the imposition of the WQPC against mines. As to the "implicit" retroactive excise tax finding, the court concluded that the County is not substantially impairing vested property rights and that the County has an interest in producing revenue to offset its own stormwater management costs. Regarding the

preemption issue, the court decided that the State's regulatory authority is distinct from the County's taxing authority.

Both parties timely appealed to this Court.

**STANDARD OF REVIEW**

Despite its name, "[t]he Tax Court is an adjudicatory administrative agency in the executive branch of state government." *Comptroller v. FC-GEN Operations Invs. LLC*, 482 Md. 343, 358 (2022) (quoting *Comptroller v. Wynne*, 341 Md. 147, 160 (2013)). As such, the decisions of the Tax Court are subject to the same judicial review standards as any other administrative agency in Maryland. *Id.* "When reviewing a decision of an administrative agency, this Court looks through the decisions of the circuit court . . . and evaluates the decision of the agency."[13] *Id.* at 359.

When reviewing factual findings and inferences drawn from those findings, we utilize the substantial evidence standard, "by which the court defers to the facts found and the inferences drawn by the agency when the record supports those findings and inferences." *Id.* We "consider whether a reasoning mind reasonably could have reached the [agency's] factual conclusion." *Id.* (quoting *Frey v. Comptroller*, 422 Md. 111, 137

_____

[13] As a preliminary matter, the County raises the issue of what entity should be entitled to deference should this Court apply a deferential standard of review. The County argues that it is not the Tax Court that should receive deference but the County Finance Director. In support, the County points to *Comptroller v. FC-GEN Operations Investments LLC*, in which the Maryland Supreme Court clarified that the Comptroller is the entity to which deference is owed for interpretations of tax law, not the Tax Court. 482 Md. at 378. We decline to address this question because, as will be described further in the Discussion, we will not be using a deferential standard of review to interpret a tax statute, and the County did not raise this issue before the circuit court.

(2011)).  An appellate court reviews the agency's decision in the light most favorable to it and "trust[s] the agency's resolution of conflicting evidence and inferences drawn therefrom."  *Id.* (cleaned up) (quoting *Broadway Servs., Inc. v. Comptroller*, 478 Md. 200, 214–15 (2022)).

We also review an agency's decision for "errors of law," which we review "*de novo* for correctness."  *Id.* at 360 (quoting *Schwartz v. Md. Dep't of Nat. Res.*, 385 Md. 534, 554 (2005)).  Categories of potential legal errors include, as relevant here, the constitutionality of the decision and "whether the agency correctly interpreted an applicable statute or regulation."  *Id.*  We review constitutionality without any deference, but we do afford a degree of deference to a decision "to the extent it is 'premised upon an interpretation of the statutes that the agency administers and the regulations promulgated for that purpose.'"  *Id.* at 360, 362 (quoting *Broadway Servs.*, 478 Md. at 214–15).  More deference is given to the agency's interpretation when it "resulted from a process of reasoned elaboration by the agency, when the agency has applied that interpretation consistently over time, or when the interpretation is the product of contested adversarial proceedings or formal rule making."  *Id.* at 363 (internal quotations omitted) (quoting *Carroll Cnty.*, 465 Md. at 203–04).

Resolution of mixed questions of law and fact "requires agency expertise."  *Id.* (quoting *Comptroller v. Sci. Applications Int'l Corp.*, 405 Md. 185, 204 (2008)).  In reviewing those questions, "we apply the deferential standard of review not only to [the agency's] fact-finding and its drawing of inferences, but also to its application of the law to the facts."  *Id.* (quoting *CBS v. Comptroller*, 319 Md. 687, 698 (1990)).  However, "if

24

the Tax Court's legal conclusions are wrong, a reviewing court may substitute the correct legal principles." *Id.* at 364 (quoting *NCR Corp. v. Comptroller*, 313 Md. 118, 134 (1988)).

**DISCUSSION**

*A. WQPC as an Excise Tax*

"Counties, being subdivisions of the State, cannot impose taxes on their own authority; rather they have authority to tax only if it is specifically granted to them by the State." *Waters Landing Ltd. P'ship v. Montgomery Cnty.*, 337 Md. 15, 19 (1994). As a charter county with home rule powers, Montgomery County obtains much of its power from the Express Powers Act. Md. Code (2013), Local Gov't §§ 10-101–330; *E. Diversified Props., Inc. v. Montgomery Cnty.*, 319 Md. 45, 49 (1990). Through the Express Powers Act, the County has police powers and the power to levy and collect property taxes. *Waters Landing*, 337 Md. at 19. The General Assembly can grant a charter county more powers than are granted in the Express Powers Act. *Id.*; *see also Montgomery Cnty. v. Md. Soft Drink Ass'n*, 281 Md. 116, 130 (1977) (rejecting argument that the Express Powers Act is the only source of county taxing authority).

Chapter 808 of the Acts of 1963 gave Montgomery County "the power to tax to the same extent as the state has or could exercise said power within the limits of the county as a part of its general taxing power" unless otherwise prohibited by State law or by a list of exceptions not relevant here. *Waters Landing*, 337 Md. at 19 (quoting Chapter 808). Thus, under Chapter 808, Montgomery County has the power to enact a tax to the same extent the State has the power, so long as the County's tax does not impede the State's enactment of a similar tax. *Id.* at 39.

*1. Tax or Regulatory Fee*

We begin with the parties' arguments about whether the WQPC is a tax at all, as it dictates whether the WQPC can be preempted by State and federal regulation of mines.[14] Porto contends that the WQPC must be classified as a regulatory fee "as contemplated by the State's enabling legislation for stormwater remediation fees," *i.e.*, EN Section 4-204, and that Maryland is the only state that allows stormwater remediation fees to be structured as taxes. Porto relies heavily on the United States Court of Appeals for the Fourth Circuit's opinion in *Norfolk Southern Railway Co. v. City of Roanoke*. 916 F.3d 315 (4th Cir. 2019). There, the Fourth Circuit ruled that similar stormwater management charges assessed by the City of Roanoke, Virginia, were regulatory fees "imposed by an agency upon those subject to its regulation" rather than a tax "imposed by a legislature upon many, or all, citizens." *Id.* at 319, 321 (quoting *San Juan Cellular Tel. Co. v. Pub. Serv. Comm'n of P.R.*, 967 F.2d 683, 685 (1st Cir. 1992)). Porto likens Montgomery County's WQPC to the charges at issue in *Norfolk Southern* and asserts that this Court should conclude that the WQPC is regulatory, as the Fourth Circuit did. In contrast, the County avers that our decision in *Shaarei Tfiloh* controls the outcome of this case. 237 Md. App. 102.

Whether a particular act imposes a regulatory fee or a tax is important because different rules of construction apply. *Md. Theatrical Corp. v. Brennan*, 180 Md. 377, 381

---

[14] The parties largely combined their arguments about whether the WQPC is a regulatory measure with their arguments about whether State and federal regulation of mining preempts any regulation by the County. Because resolution of the tax-or-fee issue dictates the discussion of both the preemption issue and the tax issue, we address the tax issue prior to and separate from the preemption issue.

26

(1942). In general, "when it appears from the Act itself that revenue is its main objective, and the amount of the tax supports that theory, the enactment is a revenue measure," especially where no further conditions need to be met to carry on the business. *Id.* at 381–82. More specifically, the Maryland Supreme Court has relied upon the following definition of tax: "[A] 'tax' [is] an 'enforced contribution to provide for the support of [the] government.' Courts have generally defined taxes as 'taking money from the taxpayer for public purposes.'" *E. Diversified*, 319 Md. at 54 (citations omitted) (quoting *United States v. Maryland*, 471 F.Supp. 1030, 1036 (D. Md. 1979)). Conversely, "where the fee is imposed for the purpose of regulation, and the statute requires compliance with certain conditions in addition to the payment of the prescribed sum, such sum is a license proper, imposed by virtue of the police power." *Brennan*, 180 Md. at 381 (quoting 33 Am. Jur. *Licenses*, ¶ 19, p. 340).

"There is no set rule by which it can be determined in which category [*i.e.*, tax or fee] a particular Act primarily belongs." *Id. Maryland Theatrical Corp. v. Brennan* instructs a court to look to the primary purpose of the enactment and determine whether that purpose is regulatory or revenue-raising. *Id.* A charge may be a tax despite its label and the fact that it is "directed to specialized funds rather than a general treasury." *Accokeek, Mattawoman, Piscataway Creeks Cmtys. Council, Inc. v. Md. Pub. Serv. Comm'n*, 227 Md. App. 265, 298 (2016), *aff'd*, 451 Md. 1 (2016). Further, "the purpose of the enactment governs rather than the legislative label." *Campbell v. Mayor & Aldermen of City of Annapolis*, 289 Md. 300, 305 (1981).

The Supreme Court's discussions in *Brennan* and *Eastern Diversified Properties, Inc. v. Montgomery County* are illustrative. In *Brennan*, the Court held that the enactment at issue, which required paid permits for venues in Baltimore City to hold certain events, was primarily a revenue measure. *Brennan*, 180 Md. at 382. The Court stated that "if it is confined to that purpose [of raising revenue], the amount of the tax is not open to any constitutional objection here, even though it may destroy the activities taxed." *Id.* However, the Court went on to hold that the act was not wholly a revenue measure because it granted the Police Commissioner discretion to "determine the amount of the tax within the limits proposed," such that "[t]he provisions with respect to the amount of the tax or fee have to be considered as regulatory." *Id.* at 382–83. The Court explained that the "taxing power cannot be used to validate that which is void under the police power." *Id.* at 385.

In *Eastern Diversified*, the Court considered whether a development impact fee was a regulatory fee or a tax. 319 Md. at 46. The Court stated that "the primary and predominant purpose of the enactment of the development impact fee is to raise revenue, regardless of what incidental regulatory effect the imposition of the fees may have on development within the county." *Id.* at 55. The Court reached this conclusion after considering the statute's stated objective of raising funds for highway improvements and the fact that "no further conditions . . . must be met by the developer when the impact fee is assessed." *Id.* at 54–55. Further, the Court clarified that

> [t]he relationship between the fee and the benefit to the property owner necessary for the measure to be regulatory in effect is not just that the property owner receive some benefit from the improvement . . . but . . . [that]

28

> "[t]he amount must be reasonable and have some definite relation to the purpose of the Act."

*Id.* at 55 (quoting *Brennan*, 180 Md. at 381).

When the County amended MCC Section 19-35 to make the WQPC an excise tax in 2015, the County made additional findings, including that making the WQPC an excise tax "furthers the original purpose of Section 19-35 to require individual owners of property with impervious surfaces to pay a share of the public costs associated with mitigating and remediating the environmental impact of stormwater runoff throughout the County" and that "[a]ll property owners have benefitted from water quality protection and restoration measures made possible by the revenues generated from the [WQPC]." 2015 L.M.C. ch. 54, § 3. This indicates that the purpose of the enactment was to raise revenue and benefit the general public. Further, EN Section 4-204, which was the original enabling statute for the WQPC, authorized the County to "adopt a system of charges to *fund the implementation of stormwater management programs*." EN § 4-204(d) (emphasis added). The County's stated purpose in Section 19-35 and the authorized purpose under EN Section 4-204 demonstrate that the purpose of the WQPC is not to regulate stormwater but to raise funds.

We also agree with the County that *Shaarei Tfiloh* controls this case. There, this Court upheld Baltimore City's Stormwater Fee as an excise tax on the maintenance of impervious surfaces. *Shaarei Tfiloh*, 237 Md. App. at 140. In considering whether Baltimore's charge was a tax or a fee, the Court noted that revenue generated from the charge was "utilized for the benefit of the general public" and that "there is no additional obligation imposed under [the Baltimore City Code] on owners of non-exempt properties

apart from the requirements to pay the Stormwater Fee." *Id.* at 139. Further, we stated that "[a]lthough the money raised via the Stormwater Fee goes to 'specialized funds' and not into the 'general treasury,' that does not prevent its categorization as a tax." *Id.* (citing *Accokeek, Mattawoman, Piscataway Creeks Cmtys. Council*, 227 Md. App. at 298). We also noted that "the Stormwater Fee does not qualify as a user fee or service charge because it is not based on a commodity or service consumed." *Id.* at 139–40.

The Montgomery County WQPC does not differ in any meaningful way from the Stormwater Fee at issue in *Shaarei Tfiloh* such that we can reach a different outcome in this case. Montgomery County created the WQPC under EN Section 4-204, which authorized counties and municipalities to "adopt a system of charges to *fund the implementation of stormwater management programs*." (Emphasis added.) This is functionally the same public purpose we approved of in *Shaarei Tfiloh*. 237 Md. App. at 138 (purpose was "financ[ing] the costs of improving the City stormwater management system, including its watershed protection and restoration program" (internal quotations omitted)). The WQPC is not regulatory simply because it funds specific programs and may have incidental regulatory effects. *Id.*; *see also E. Diversified*, 319 Md. at 54–55 (upholding development impact fees that "fund[ed], in part, the improvements necessary to increase the transportation system capacity in the impact fee areas . . . regardless of what incidental regulatory effect the imposition of the fees may have on development"). The WQPC does not require a property owner to do anything with their property other than pay the charge. *See Shaarei Tfiloh*, 237 Md. App. at 139.

Porto attempts to distinguish *Shaarei Tfiloh* in several different ways. Primarily, it asserts that the WQPC is subject to the requirement of EN Section 4-202.1(e)(3) that a charge under the statute be "based on the share of stormwater management services related to the property and provided by the county or municipality." Porto argues that this requirement is "apparently" absent from the enabling statute of Baltimore City's Stormwater Fee. Porto is incorrect. *Shaarei Tfiloh* clearly states that Baltimore adopted its Stormwater Fee "following the mandate contained in [EN Section] 4-202.1." 237 Md. App. at 114. Article 27 of the Baltimore City Code, which contains the provisions creating the Stormwater Fee, defines "Enabling Law" as "State Environment Article § 4-202.1." Balt. City Code, Art. 27, § 1-1(d). Thus, both Baltimore City's Stormwater Fee and Montgomery County's WQPC are subject to EN Section 4-202.1(e)(3), Baltimore directly under 4-202.1 and the County via EN Section 4-204(d)(4) ("The charges [established under 4-204] shall be assessed in a manner consistent with § 4-202.1(e)(3) and (f) of this subtitle.").[15]

Because the primary purpose of the WQPC is to generate revenue, as informed by our decision in *Shaarei Tfiloh*, we conclude that the WQPC is a tax and not a regulatory fee.

---

[15] Porto also argues that "the stormwater management charge at issue in *Shaarei* [*Tfiloh*] had more ambiguous language regarding nonpayment and recognizes a significant credit for properties with an NPDES permit." This distinction has no bearing on the consideration of whether the WQPC is a regulatory fee or a tax. Similarly, Porto's unsupported claim that the synagogue that brought the challenge to the Baltimore Stormwater Fee "lacked the resources to appeal the faulty *Shaarei* [*Tfiloh*] decision" does not change the outcome here, as we remain bound by a reported decision from this Court.

## 2. *Excise or Property Tax*

Having concluded that the WQPC is a tax and not a regulatory fee, we must next address whether it is an excise tax or a property tax. Porto asserts that stormwater remediation fees like the WQPC "are not meant to be excise taxes" and that similar fees in other states and other Maryland counties are structured as service fees or property taxes, indicating that Montgomery County's excise tax is abnormal. Porto also distinguishes *Shaarei Tfiloh*'s holding that Baltimore City's stormwater remediation fee was an excise tax. Conversely, as it does with the tax-or-fee issue, the County contends that *Shaarei Tfiloh* controls the excise-or-property tax issue.

In *Weaver v. Prince George's County*, the Supreme Court defined a property tax as "a charge on the owner of property by reason of [their] ownership alone without regard to any use that might be made of it." 281 Md. 349, 357 (1977). The Court cited several related definitions of an excise tax, including that it is "a tax imposed upon the performance of an act, the engaging in an occupation, or the enjoyment of a privilege," before concluding that it "embrace[s] every form of taxation that is not a burden directly imposed on persons or property." *Id.* at 357–58 (emphasis omitted) (quoting *Cont'l Motors Corp. v. Twnshp. of Muskegon*, 135 N.W.2d 908, 911 (Mich. 1965)). The Court continued:

> Thus, it has been held that where a tax is levied directly by the Legislature without assessment and is measured by the extent to which a privilege is exercised by a taxpayer without regard to the nature or value of [their] assets, it is an excise. Where, however, the tax is computed upon a valuation of the property and is assessed by assessors, and where the failure to pay the tax results in a lien against the property, it is a property tax, even though a privilege might be included in the valuation.

*Id.* at 358. Ultimately, the *Weaver* Court drew upon three factors to differentiate between a property tax and an excise tax: "the designation placed upon the tax by the Legislature, the subject matter of the tax, and the incidents of the tax, *i.e.*, the manner in which it is assessed and the measure of the tax." *Id.* at 356. As to the first factor, the Court held that the label given by the legislature should be given "considerable weight,"[16] although the "nature of any tax should be determined by reference to its actual operation and practical effect." *Id.*

The Court later clarified the three factors from *Weaver* in *Waters Landing Limited Partnership v. Montgomery County*. 337 Md. 15. The *Waters Landing* Court assessed the three factors as: (1) the label given by the legislature; (2) the tax's "actual operation and practical effect"; and (3) "the methods used to impose [the taxes] to fix their amount." *Id.* at 25–26 (quoting *Weaver*, 281 Md. at 356, 358). In discussing the "actual operation" of the development impact tax at issue in *Waters Landing*, the Court stated that "[i]t is not imposed simply because the taxpayer owns the land; rather it is imposed only when the owner of land makes a particular use of the land, *i.e.*, develops it." *Id.* at 26. As to the third factor, the Court explained that the tax at issue was "levied directly by the Montgomery County Council, without assessment, on all who seek to develop land within the designated districts" and to what extent, rather than based on the value of such land. *Id.* at 27. The Court was also persuaded that the development impact tax was an excise tax

---

[16] This is in contrast to the analysis of whether an enactment is a fee or a tax, in which the legislative label has no sway. *Shaarei Tfiloh*, 237 Md. App. at 137, 141.

because a lien resulting from nonpayment was imposed on all of the taxpayer's property, rather than just the property taxed, as would be expected for a property tax. *Id.*

Under the considerations set forth in *Weaver* and *Waters Landing*, the WQPC is an excise tax, not a property tax. The first factor—the label given by the legislature—clearly weighs in favor of this conclusion. As originally enacted, the WQPC was labeled as a "charge" without clear indication of the County Council's characterization of it. The County Council then clarified the characterization in 2015 when the WQPC was labeled an excise tax. At all times relevant to this appeal, the County Council designated the WQPC as an excise tax.

The WQPC's "actual operation and practical effect" also indicate that it is an excise tax rather than a property tax. The WQPC is not imposed upon Porto solely because it owns land but rather because of Porto's use of that land, which is "only one of the many incidents which make up the bundle of rights, powers, privileges and immunities, collectively regarded as property or ownership." *Weaver*, 281 Md. at 359. As we discussed in *Shaarei Tfiloh*:

> The General Assembly determined that the proportion of impervious surface area of a property is a proxy for usage of stormwater system services. The charge is based on an aspect of the use of the property—the amount of impervious surface. It is not based on the value of the property or ownership of the property. Thus, the Stormwater Fee "is not imposed simply because the taxpayer owns the land; rather it is imposed only when the owner of land makes a particular use of the land, i.e., develops it."

*Shaarei Tfiloh*, 237 Md. App. at 142–43 (quoting *Waters Landing*, 337 Md. at 26).

Regarding the last factor, the methods used to calculate the tax are a closer call. *Weaver* described the distinction between an excise tax and a property tax:

Thus, it has been held that where a tax is levied directly by the Legislature without assessment and is measured by the extent to which a privilege is exercised by a taxpayer without regard to the nature or value of [their] assets, it is an excise. Where, however, the tax is computed upon a valuation of the property and is assessed by assessors, and where the failure to pay the tax results in a lien against the property, it is a property tax, even though a privilege might be included in the valuation.

*Weaver*, 281 Md. at 358. Unlike a property tax, the WQPC does not require any assessment of the value or nature of the property being taxed. It is measured only through "the extent to which a privilege is exercised by a taxpayer." *Id.* In applying this factor to the Baltimore Stormwater Fee, *Shaarei Tfiloh* concluded that the fee "amount has no relation to the value of the land, as a property tax would. Instead, it is based on the extent to which a property owner maintains impervious surfaces on the land." *Shaarei Tfiloh*, 237 Md. App. at 143. Like the WQPC, Baltimore's Stormwater Fee "amount assessed [was] specifically tethered to the measurement of a property's impervious surface, calculated pursuant to a standardized metric . . . multiplied by the specific property's particularized use." *Id.*

Conversely, *Weaver* noted that a tax that "saddles the property directly with a lien" for nonpayment is a traditional attribute of a property tax. *Weaver*, 281 Md. at 364. For the WQPC, "any unpaid Charge [may be treated] as a lien on the property to which the charge applies." MCC 19-35(a). This feature of the WQPC shifts its characterization closer to that of a property tax. It is, however, just one aspect of the WQPC that is similar to a property tax amongst several that indicate it is an excise tax. Given the weight of the other factors, the fact that the penalty for nonpayment of the WQPC is a lien on the property itself does not upend the other characteristics that lead us to conclude it is an excise tax.

35

This analysis is bolstered by a 2006 opinion of the Attorney General of Maryland.[17] 91 Md. Op. Atty. Gen 152 (2006). In response to a request about what "system of charges" a county or municipality could impose under EN Section 4-204, the Attorney General concluded that

> EN §4-204(d) allows the governing body of a county or of a municipal corporation to impose charges in the form of *either a regulatory fee or a tax, or a combination of fee and tax*, for the purposes set forth in the statute. The appropriate characterization of the charge will depend on the terms of local legislation implementing the charges. *To the extent that the charge imposed is an excise tax*, it need not be limited to charges collected upon the filing of a stormwater management plan.

*Id.* at 163 (emphasis added). Regarding the authority to utilize an excise tax rather than a property tax, the Attorney General stated that

> [t]he language of EN §4-204(d) indicates that a charge authorized by that statute may be distinct from a property tax in that it authorizes collection "in the same manner as . . . property taxes" may be collected. EN § 4-204(d)(3). In our view, *the statute authorizes the County to impose an excise tax, reflecting the use of property, to fund ongoing stormwater management efforts*.

*Id.* at 161 (emphasis added). According to the Attorney General, EN Section 4-204(d) clearly envisions that the "system of charges" it authorized could take the form of an excise tax. Thus, the County's use of an excise tax to implement the WQPC aligns with the authorization of EN Section 4-204.

---

[17] "Although we are not bound by an Attorney General's opinion, 'when the meaning of legislative language is not entirely clear, such legal interpretation [by the Attorney General] should be given great consideration in determining the legislative intention.'" *Donlon v. Montgomery Cnty. Pub. Schs.*, 460 Md. 62, 95 (2018) (quoting *State v. Crescent Cities Jaycees Found., Inc.*, 330 Md. 460, 470 (1993)).

In contrast, Porto points to a 2001 memorandum of the Montgomery County Attorney that Porto claims demonstrates that the WQPC should be a property tax and not an excise tax. The memorandum sought to address whether a "'user fee' to fund the cost of the County assuming responsibility for maintaining certain stormwater management facilities" would constitute a tax and, if so, what "the advantages and disadvantages of structuring the tax as an excise tax or a property tax" would be. The County Attorney responded that structuring the charge "either as an excise tax or as an *ad valorem* property tax [would both be] legally sound options" and that "the type of tax that represents the best option for the County ultimately depends on the County's priorities." The memorandum went on:

> If the County is primarily interested in minimizing any questionability about its actions in a legal challenge, then an *ad valorem* property tax would seem the most reasonable approach to pursue since the County's authority to fund its stormwater management program through an *ad valorem* tax is clear. If, on the other hand, the priority is to pursue a tax based on a formula that factors in stormwater runoff and other pertinent environmental considerations, an excise tax might be more logical because the tax would actually be linked to the problem-causing activities that the County is trying to keep in check.

(Footnote omitted.) Porto asserts that this section of the memorandum indicates that the WQPC should be a property tax, as suggested by the County Attorney before its enactment. The County Attorney, however, did not make any formal recommendations about which approach the County Council should adopt. The memorandum is clear that the County Attorney viewed both an excise tax and a property tax as viable options for the County, depending upon what aspects of the WQPC the County wanted to emphasize. As such, Porto's reliance on the memorandum is misplaced.

37

Although Porto attempts to distinguish the WQPC and the Baltimore Stormwater Fee, we are likewise persuaded by the County's argument that *Shaarei Tfiloh* binds the outcome on the excise-or-property tax issue. First, Porto argues that *Shaarei Tfiloh* recognized that Montgomery County has different express powers than those of Baltimore City. *Shaarei Tfiloh*, 237 Md. App. at 130 n.17. However, both Montgomery County and Baltimore City have been granted the power to tax within their geographic boundaries to the same extent as the State, subject to certain exceptions not relevant here. 1963 Md. Laws ch. 808 (enacting what is now MCC § 52-17(a), upheld as a valid public local law in *Md. Soft Drink Ass'n*, 281 Md. at 130–31); Balt. City Charter, Art. II § 40(a). Further, both the WQPC and the Stormwater Fee were specifically authorized by the General Assembly, the WQPC under EN Section 4-204 and the Stormwater Fee under EN Section 4-202.1.

Second, Porto asserts that unlike Baltimore City, Montgomery County has a statutory definition of an excise tax. MCC § 52-21(a)(1). Porto is correct that Baltimore City does not have an explicit definition of an excise tax within its code or charter; however, Montgomery County's definition is substantially the same as the one offered by the Supreme Court. MCC Section 52-21(a)(1) defines an excise tax as "any tax not directly imposed on property." The Supreme Court has defined an excise tax as "'a tax imposed upon the performance of an act, the engaging in an occupation, or the enjoyment of a privilege' which 'is said to embrace every form of taxation *that is not a burden directly imposed on persons or property*.'" *Md. Econ. Dev. Corp. v. Montgomery Cnty.*, 431 Md. 189, 200 (2013) (emphasis added) (quoting *Weaver*, 281 Md. at 357–58). Thus, any valid

excise tax imposed by Baltimore City must be the same as one imposed by Montgomery County, regardless of the County's greater specificity in its code.[18]

### 3. Retroactive Tax on a Vested Right

Finally, Porto argues that the WQPC is an invalid retroactive tax on a vested right because it taxes impervious surfaces that were on Porto's property before the County imposed the WQPC. We conclude that Porto has not preserved this issue for appellate review.

A reviewing court "may not pass upon issues presented to it for the first time on judicial review and that are not encompassed in the final decision of the administrative agency." *Dep't Health & Mental Hygiene v. Campbell*, 364 Md. 108, 123 (2001). "The 'primary purpose' of this rule 'is to give the administrative agency the opportunity to decide the issue' because, 'when an appellate court is the first to decide an issue, it deprives the agency of that opportunity.'" *Concerned Citizens of Cloverly v. Montgomery Cnty. Plan. Bd.*, 254 Md. App. 575, 600 (2022) (quoting *Colao v. Md.-Nat'l Cap. Park & Plan. Comm'n*, 167 Md. App. 194, 202 (2005)). "[A] passing reference to an issue, without making clear the substance of the claim, is insufficient to preserve an issue for appeal, particularly in a case with a voluminous record." *Id.* at 603; *see also id.* at 602 ("The question in determining whether an issue was preserved . . . [is] whether it was raised with

---

[18] Porto also highlights that the Stormwater Fee in *Shaarei Tfiloh* had different credit provisions and ambiguous language regarding nonpayment. It is unclear—nor does Porto attempt to explain—why those provisions should differentiate the excise-or-property tax issue in *Shaarei Tfiloh* from the one in this case. Although the nonpayment penalties do alter the analysis, as discussed above, the WQPC nonpayment provisions alone do not turn the WQPC into a property tax.

sufficient precision, clarity, and emphasis to give the agency a fair opportunity to address it." (quoting *Ctr. for Sustainable Econ. v. Jewell*, 779 F.3d 588, 602 (D.C. Cir. 2015))). "[E]ven constitutional issues 'must be pursued and exhausted' before the relevant administrative agency 'before resort[ing] to the courts.'" *Yim, LLC v. Tuzeer*, 211 Md. App. 1, 49 (2013) (quoting *Prince George's Cnty. v. Ray's Used Cars*, 398 Md. 632, 651 (2007)).

The record is clear that Porto raised a retroactivity challenge to the County in its credit applications and appeals, arguing that the County could not tax the impervious surface on its property that was in place years before the enactment of the WQPC because it constituted "an ultimatum to pay a tax for a pre[-]existing and legal use of land, or give up all or a portion of a pre-existing legal use of land." However, Porto's filings and arguments before the Tax Court did not clearly demonstrate that Porto was continuing to challenge the WQPC on the grounds that it retroactively taxed existing impervious surfaces.

Porto's amended petition to the Tax Court listed 27 questions to be reviewed by the Tax Court that "demonstrate how [the County's] actions taken against Porto were illegal and erroneous." None of those questions made any reference to retroactive taxation of a vested right.[19] In its pretrial brief to the Tax Court, Porto challenged the validity of the WQPC on two primary grounds. First, Porto argued that the WQPC is a property tax, not

---

[19] Porto did reference impervious surfaces in its petition but only in the context of arguing that the WQPC should be classified as a property tax because such surfaces are improvements.

an excise tax, and thus violates the Maryland Constitution because it is not uniformly applied. Second, Porto contended that the County legislation that made the WQPC an excise tax was improperly enacted. Again, neither of these arguments clearly indicate a retroactivity challenge to the WQPC.

At the trial before the Tax Court, Porto's counsel did expressly reference "the retroactive application of this tax." However, the basis of this argument was not that the WQPC retroactively taxed impervious surfaces. Porto relied on *Waters Landing* for the proposition that an ordinance interferes with vested rights when it attempts "retroactively to change legislative policy," including by taking away the right to recover money that was due to a property owner when the act was passed. Porto's counsel then explained that he interpreted the County to say, "we're the County, we have the taxing authority, we can do whatever we want. We are going to call this an excise tax and you can't do anything about it." He continued:

> However, when it impacts a vested right and they try to apply it retroactively, the law is clear, you can not do that and apply it retroactively. I think prior to 2015 when they . . . didn't call it an excise tax when they made these amendments, people were - - this was on their property bill and people were writing this off, accountants were writing this off as a tax deduction. At least parts of it.
>
> When they amended it in 2015 and said this is now an excise tax, which is not deductible, *they took away a vested right and they took it away from every homeowner in Maryland*, certainly, you know, for that limited purpose, it's still a vested right. They changed it and they couldn't. They couldn't effectively say it's an excise - - well obviously they could've said it's an excise tax if they wanted, and they could've made it tax deductible, they didn't.

41

(Emphasis added.)[20]

As such, the thrust of Porto's argument regarding retroactivity was that the County could not revoke citizens' ability to claim a tax deduction for WQPC payments, which they were apparently able to do before the 2015 amendment to MCC Section 19-35. This argument about whether the County can remove a previously-available tax deduction is not synonymous with an argument about whether the County can impose an excise tax on the use of property already in existence before the enactment of the tax.[21] *Cf. Jeffries v. State*, 113 Md. App. 322, 341–42 (1997) (holding that objecting to admission of evidence on relevance grounds is not the same as objecting on unfair prejudice grounds); *Krause Marine Towing Corp. v. Ass'n of Md. Pilots*, 205 Md. App. 194, 224–25 (2012) (holding that the appellants' argument challenging one aspect of the relevant statute on appeal was a narrower challenge than the facial challenge to the entire statute presented at trial).

The sole reference to taxing impervious surfaces in filings to the Tax Court appears in Porto's Post Trial Summary of Testimony, filed at the Tax Court's request. The Post

---

[20] Although not dispositive, it is noteworthy that this instance at the Tax Court trial is the first time the phrase "vested rights" was used at any point in the record.

[21] Porto's reliance on *Waters Landing* at the Tax Court trial further distinguishes Porto's argument there from its argument on appeal. The primary discussion in *Waters Landing* surrounded "whether Montgomery County may impose development impact taxes retroactively to encompass charges earlier levied as development impact 'fees.'" 337 Md. at 18. The Supreme Court concluded that the County could enact curative legislation that made an impact fee an impact tax and ratified previously-collected charges because there was no change in legislative policy. *Id.* at 21–22, 31–32. By analogizing its case to *Waters Landing*, Porto suggested not that the County cannot tax existing impervious surface but rather that the County's attempt to "retroactively validate[] and ratif[y] the levy and collection under Section 19-35 of all stormwater management charges collected since July 1, 2013[,]" 2015 L.M.C. ch. 54, § 3, was an invalid change in legislative policy.

Trial Summary contained the following heading: "An Excise Tax Cannot Be Retroactively Applied to Vested Rights, Such as the Impervious Property [sic] [Porto] Already Had on Its Property at the Time the Excise Tax Was Promulgated." However, the substance of that section challenged the County's attempt to "retroactively designate [the WQPC] as an 'excise tax' . . . despite having operated for more than a decade . . . under Maryland State environmental law." Porto went on to argue that it had impervious surfaces on its property before the WQPC became an excise tax and that because the County cannot retroactively tax a vested right, the WQPC is invalid when assessed on impervious surfaces that predate its promulgation.

This portion of Porto's Post Trial Summary of Testimony is insufficient to preserve its retroactivity argument for two reasons. First, it is the first mention of this particular argument to the Tax Court, as it was not raised in either Porto's pre-trial briefing to the Tax Court or at the trial before the Tax Court.[22] Second, it constitutes only a passing mention of the specific issue of whether the County can tax impervious surfaces already on the property. Porto made no substantive arguments about why it believed the impervious surfaces on its property constitute a vested right and made only broad references to case law[23] that supported its assertion that the County cannot tax vested rights. We conclude

---

[22] As previously described, Porto's arguments on retroactivity at the Tax Court trial were related but not equivalent to the argument its presents on appeal.

[23] Porto cited to *Allstate Insurance v. Kim* to support its claim that the County cannot tax vested rights. 376 Md. 276 (2003). This was the first reference to *Kim* in any of Porto's arguments to both the Tax Court and the County, and Porto provided no indication of where in the opinion it was drawing its assertion from, nor did it provide any analysis of how *Kim* would apply here.

that this amounts only to a passing reference to an issue that does not "mak[e] clear the substance of the claim." *Concerned Citizens of Cloverly*, 254 Md. App. at 603.

Porto's proposed findings and order, filed alongside its Post Trial Summary of Testimony, do not offer any additional clarity. The relevant portion reads:

> 3. The County's amendments also purported to "ratify[] the collection of all stormwater management charges levied under County Code Section 19-35 since July 1, 2013." [2015 L.M.C. ch. 54, § 3.]
>
> 4. [Porto's] property had impervious surface on its property prior to the enactment of the WQPC.
>
> 5. The [WQPC] may not be charged retroactively by Montgomery County to [Porto] for 2016 and the years prior to 2016 for [the relevant parcels].
>
> 6. The County may not retroactively tax a vested right. *Allstate Ins. v. Kim*[, 376 Md. 276 (2003)].

Again, it is unclear from these proposed findings whether Porto was challenging the curative aspect of the promulgation of the WQPC as an excise tax or challenging the imposition of the WQPC on pre-existing impervious surfaces. Given that Porto had explicitly argued the former before the Tax Court and the latter before the County, the substance of which of its various retroactivity arguments Porto was pursuing in the Tax Court remained unclear. In the absence of a clear request for the Tax Court to decide the retroactivity issue, we decline to address it for the first time on appeal.

## B. *Application of the WQPC Against Porto*

In addition to the above facial challenges to the WQPC as an excise tax, Porto argues that the WQPC was improperly applied to Porto. For the reasons set forth below, we reject each of Porto's challenges.

44

*1. Relation to Services Provided by the County*

Porto argues that the WQPC does not comply with the requirement of EN Section 4-202.1(e)(3)(i) that a stormwater remediation charge established under 4-202.1 or 4-204 "shall [be] set . . . in an amount that is based on the share of stormwater management services related to the property and provided by the county or municipality." Porto contends that "the County provides no significant stormwater services to Porto's properties" and thus cannot impose the WQPC against Porto. The County responded at oral argument by stating its position that the County is authorizing the WQPC according to its excise tax authority with the goal of raising revenue without a tie to services provided by the County to the taxed impervious surfaces.

We first address the County's contention that the WQPC does not have to relate to stormwater services provided by the County because the County Council repromulgated the WQPC as an excise tax under its general taxing authority. Although the County argues that as an excise tax, the County does not need to follow the requirements of EN Section 4-204, we conclude that although the WQPC is a valid excise tax, both MCC Section 19-35 and EN Sections 4-202.1 and 4-204 indicate that the County must still comply with State law requirements for a stormwater remediation charge.

Section 19-35(a) of the County Code reads: "As authorized by Section 52-17(a) [of the MCC, containing the County's general taxing authority] or Maryland Code, Environment Art., § 4-204, or both, the Director of Finance must annually impose and collect a Water Quality Protection Charge, as provided in this Section." The County's reading of this section suggests that because the statute relies upon alternative authorities,

45

the County can choose which of those authorities it wants to use as the basis for the WQPC. However, when the County made this amendment to the WQPC, it included additional language in Section 3 of the County bill that reads: "This Act is not intended to alter the policy, purpose, or substance of Section 19-35." 2015 L.M.C. ch. 54, §3. As such, although the County provided alternative authority for the enactment of the WQPC and intended to correct the deficiency noted by the Circuit Court for Montgomery County in *Chod*, the County Council made clear that it was not changing the policy and substance of the WQPC. This indicates that the requirements of State law—*i.e.*, EN Section 4-204 that originally authorized the WQPC—remained binding on the County.

Additionally, when read in conjunction with one another, Sections 4-202.1 and 4-204 of the State Environment Article demonstrate a legislative intent by the General Assembly that counties and municipalities should comply with the requirements of those sections when implementing stormwater remediation charges. Subsections 4-202.1(a)(2) and (3) provide two exemptions for 4-202.1 as a whole: subsection (a)(2) provides an exemption for a "county or municipality that, on or before July 1, 2012, *has enacted and implemented a system of charges under § 4-204 of this subtitle . . .* in a manner consistent with the requirements of this section" (emphasis added), and subsection (a)(3) provides an exemption for Montgomery County except for subsection (j). When Section 4-202.1 was enacted, only a few counties, including Montgomery County, had implemented stormwater remediation charges under Section 4-204(d). Dep't of Legis. Servs., Fiscal & Policy Note, H.B. 987, at 7 (2012). Thus, Montgomery County was originally exempt from the requirements of Section 4-202.1 because the County was already complying with the

requirements of Section 4-204. When additional requirements were added to Section 4-202.1, rather than requiring that Montgomery County comply for the first time with the entirety of Section 4-202.1, the additional requirements were added to Section 4-204(e) as a subsection that applied only to "a system of charges established by Montgomery County under subsection (d) of this section." 2015 Md. Laws ch. 124. This legislation also added the requirement in Section 4-204(d) that the charges under that section "shall be assessed in a manner consistent with § 4-202.1(e)(3) and (f) of this subtitle." *Id.*

Based upon the special consideration the General Assembly gave to Montgomery County when amending the Stormwater Management Subtitle of the Environment Article, it would be contrary to the legislative intent of the subtitle to now allow the County to ignore the requirements put into place by the State. *Doe v. Montgomery Cnty. Bd. of Elections*, 406 Md. 697, 712 (2008) (in statutory interpretation, we "read[] the statute as a whole to ensure that 'no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless or nugatory'" (quoting *Barbe v. Pope*, 402 Md. 157, 172 (2007))). Section 4-202.1(a)(2) allows an exemption only for counties and municipalities with charges enacted under Section 4-204 and "in a manner consistent with the requirements of" Section 4-202.1. Section 4-204(e) would be superfluous if the County does not have to follow the requirements of Section 4-204 because the WQPC is a general excise tax rather than an excise tax promulgated under that section. These sections suggest that the General Assembly assumed that any stormwater remediation charge would abide by the requirements set forth in the Stormwater Management Subtitle.

Having determined that Montgomery County must comply with the requirements of EN Section 4-204, we next turn to Porto's argument that the County is not complying with those requirements. Specifically, Porto alleges that the County provides no stormwater management services to Porto's property and that the WQPC therefore is not "based on the share of stormwater management services related to the property and provided by the county" as required by EN Section 4-202.1(e)(3)(i) via Section 4-204(d)(4).

The County changed the WQPC's enabling legislation in response to a decision by the Circuit Court for Montgomery County that held that the WQPC was per se invalid because it was unrelated to stormwater services provided by the County. 2015 L.M.C. ch. 54, § 3; *Chod*, No. 398704-V. There, the County had argued that EN Section 4-202.1(e)(3)(ii) specifically allows the imposition of a stormwater remediation charge based upon the amount of impervious surface on a property and thus such a basis for the charge was valid under the relation requirement in Section 4-202.1(e)(3)(i). *Id.* at 5–6. The circuit court rejected this interpretation. *Id.* at 6.

However, our decision in *Shaarei Tfiloh*, issued three years after the *Chod* decision, contradicts the circuit court's interpretation of Section 4-202.1(e)(3). In *Shaarei Tfiloh*'s discussion about whether the Baltimore City Stormwater Fee was an excise tax, we stated, "The General Assembly determined that the proportion of impervious surface area of a property *is a proxy for usage of stormwater system services*." 237 Md. App. at 142 (emphasis added). Thus, the WQPC operates under the valid assumption that a property's impervious surface relates to the stormwater services provided by the County. To the extent that a property owner can demonstrate that this assumption is inaccurate and that the

48

County does not provide services, *i.e.*, that the property owner treats and controls all of its stormwater, the appropriate outcome is not total non-imposition of the WQPC but instead is the owner filing an application for credit.

### 2. *Exemption for CWA Permit Holders*

Porto next argues that EN Section 4-202.1(e)(2) prohibits the County from applying the WQPC to entities that hold a CWA permit. The relevant subsections provide that "property owned by the State or a unit of State government may" only be charged a stormwater remediation fee if the government unit and county agree to certain conditions and further state: "A county or municipality may not charge a stormwater remediation fee to property specifically covered by a current national pollutant discharge elimination system Phase I municipal separate storm sewer permit or industrial stormwater permit held by the State or a unit of State government." EN § 4-202.1(e)(2)(ii).

Porto contends that this provision exempts all NPDES permit holders because it recognizes that MDE and the federal Environmental Protection Agency review those permits for CWA compliance. The County asserts that Section 4-202.1(e) does not apply to the WQPC because of Section 4-202.1(a)(3)'s exemption for Montgomery County. Assuming without deciding that Section 4-202.1(e)(2) applies to the County, we address only the narrower issue of the proper interpretation of Section 4-202.1(e)(2)(ii) and conclude that Porto's reading of that subsection is too broad.

The context of EN Section 4-202.1(e)(2)(ii) clearly indicates that it exempts State- and State government-owned property and "property specifically covered by a current [NPDES] Phase I [MS4] permit or industrial stormwater permit held by the State or a unit

49

of State government." Porto is covered under Maryland's General 15MM permit; this is neither an MS4 permit nor an "industrial stormwater permit *held by the State or a unit of State government*." (Emphasis added.) Porto seems to believe that because it is covered under a general NPDES permit, the State "holds" the permit. The State does not *hold* a general permit but rather *issues* the permit and approves coverage for those who apply. COMAR 26.08.01.01(35); *cf.* Permits Div., Off. of Water Enf't & Permits, Off. of Water, U.S. Env't Prot. Agency, General Permit Program Guidance 3–4 (Feb. 1988) ("A general permit is identical to an individual permit regarding effluent limitations, water quality standards, monitoring and sampling requirements, and enforceability."). That Porto, and not the State, "holds" the 15MM permit is also supported by *Sierra Club v. ICG Hazard, LLC*, from the United States Court of Appeals for the Sixth Circuit. 781 F.3d 281 (6th Cir. 2015). There, the Sixth Circuit held that the CWA's permit shield, which "insulates permit holders from liability for certain discharges of pollutants that the permit does not explicitly mention," applies to both individual and general NPDES permits. *Id.* at 285, 288. By Porto's logic, if the State holds the general permit, then Porto would not be eligible to receive the protections of the permit shield, an outcome that would contradict the principles set forth in *ICG Hazard*.

Further, the overall context of EN Section 4-202.1(e)(2) is focused on exempting State and local government entities from stormwater remediation fees except as provided. Section 4-202.1(e)(2)(ii)(1) details the procedures by which a county or municipality can collect a stormwater remediation fee from the State or a unit of State government. Section

50

4-202.1(e)(2)(ii)(2) exempts MS4 permits—which by name and definition[24] are held by a public entity—and other "industrial stormwater permit[s] held by the State or a unit of State government." Based upon this context, it seems clear that the General Assembly's intent was to provide an exemption for State entities that already hold a NPDES permit, not for private entities with a NPDES permit to obtain an exemption. *See Lockshin v. Semsker*, 412 Md. 257, 276 (2010) ("[T]he plain language must be viewed within the context of the statutory scheme to which it belongs, considering the purpose, aim, or policy of the Legislature in enacting the statute.").

### 3. *Exemption Due to State Regulation of Stormwater Runoff of Mines*

Finally, Porto argues that the County improperly applied the WQPC to Porto because such application is prohibited by MCC Section 19-31 and COMAR Section 26.17.02.05, which contain similar provisions.[25] MCC Section 19-31(d) reads: "The following development activities are exempt from stormwater management requirements under this Article [Article II: Storm Water Management]: . . . any land development activity

---

[24] Federal regulation generally defines "municipal separate storm sewer" as "a conveyance or system of conveyances . . . [o]wned or operated by a State, city, town, borough, county, parish, district, association, or other public body (created by or pursuant to State law) having jurisdiction over disposal of sewage, industrial wastes, storm water, or other wastes." 40 C.F.R. § 122.26(b)(8) (2022).

[25] Porto also asserts that the WQPC is preempted by State regulation of mines. However, preemption issues only arise where a local government is attempting to regulate in the same sphere as the State. *See Am. Nat'l Bldg. & Loan Ass'n v. Mayor & City Council of Balt.*, 245 Md. 23, 33 (1966) ("We think that the Savings and Loan Act of 1961 imposing a State franchise tax was regulatory and did not preempt the power of the City to impose a privilege tax for revenue purposes."). Because we have already concluded that the WQPC is a valid excise tax and is not regulation, preemption does not apply in this case.

that the [Water Management] Administration [of MDE] finds is subject to any State law that regulates stormwater management runoff." COMAR Section 26.17.02.05.B(3) reads: "The following activities are exempt from the provisions of this chapter [Chapter 2: Stormwater Management]: . . . [l]and development activities which the [Water Management] Administration determines will be regulated under specific State laws which provide for managing stormwater runoff."

Porto asserts that both of these provisions exempt mines from the WQPC because mines are one of the most highly regulated land use activities in the State. *See E. Star v. Cnty. Comm'rs of Queen Anne's Cnty.*, 203 Md. App. 477, 489 (2012) ("The General Assembly, in Title 15, Subtitle 8 of the Env. Article, has enacted a very elaborate scheme regulating virtually all aspects of surface mining in Maryland."). In response, the County argues that County law only exempts certain activities from "stormwater management requirements" such as design and maintenance requirements for management systems and that, as an excise tax, the WQPC is not a stormwater management requirement under MCC Section 19-31.

We need not address whether the WQPC is a stormwater management requirement subject to specified exemptions. Instead, we conclude that Porto has not demonstrated that the Water Management Administration has either found mining to be "subject to any State law that regulates stormwater management runoff" or determined that mining "will be regulated under specific State laws which provide for managing stormwater runoff." Both parties overlook this fundamental requirement for exemption under MCC Section 19-31 and COMAR Section 26.17.02.05.B; neither party presents an argument about what it

means for the Water Management Administration to find that a development activity is subject to State stormwater management requirements and whether it has made such a determination for mines, nor has this Court found any indication of the Water Management Administration's process or other instances of exemption.

Porto's sole rationale for claiming exemption under MCC Section 19-31 and COMAR Section 26.17.02.05 is that "[q]uarries/mines are among the most regulated entities in the State and must comply with rigorous State laws." That mines are regulated by the State does not inherently mean that the Water Management Administration has found their stormwater to be regulated, nor does Porto describe any specific ways in which mine stormwater is regulated by the State. Although this Court has accurately noted the "very elaborate scheme regulating virtually all aspects of surface mining in Maryland," our discussion in *East Star v. County Commissioners of Queen Anne's County* is not synonymous with the Water Management Administration finding that mine stormwater is regulated. 203 Md. App. at 489.

## C. Award of Credit to Porto

In its cross appeal, the County alleges that the Tax Court erred in awarding credits to Porto. The County asserts that the County Code's stormwater management provisions are distinct from its erosion and sediment control provisions and thus that the Tax Court improperly conflated the two bodies of law in deciding that Porto could receive WQPC credit for sediment and erosion control practices. The County further contends that Porto's purported stormwater management does not conform to the County's Stormwater Management Article and the Design Manual and therefore does not qualify for WQPC

credit. In the alternative, the County argues that if Porto is eligible for WQPC credits, the Tax Court improperly decided that Porto was entitled to a 100% credit without the analysis required by COMCOR 19.35.01.05 and set forth in the County WQPC Credit Procedures Manual, including that the Tax Court awarded a 100% credit despite County regulation allowing a 60% credit for non-ESD practices like Porto's.

Porto responds that the Tax Court was justified in awarding Porto a 100% credit because Porto presented uncontroverted evidence and testimony that it treats 100% of its stormwater. Further, Porto asserts that the County Stormwater Management Article only requires ESD as a means of stormwater management to the maximum extent practicable, which Porto avers it has implemented. Porto also argues that the Design Manual is only a guide for stormwater management practices that are eligible for credit, not the exclusive source of credit-eligible practices.

### 1. Practices Eligible for WQPC Credit

The preliminary issue we must address is whether MCC Section 19-35 and its associated regulations allow WQPC credit for stormwater management practices that are either not specified in the Design Manual or are primarily for sediment and erosion control purposes rather than for stormwater management. Because this is a matter of statutory interpretation, we review it as a matter of law. *FC-GEN*, 482 Md. at 360. In doing so, our primary objective is to ascertain the legislature's—here, the Montgomery County Council's—purpose and intent in enacting the MCC. *Berry v. Queen*, 469 Md. 674, 687 (2020). We first look to the "normal, plain meaning of the language of the statute, reading the statute as a whole." *Id.* (quoting *Brown v. State*, 454 Md. 546, 550–51 (2017)). This

54

includes viewing the "plain language . . . 'within the context of the statutory scheme to which it belongs, considering the purpose, aim or policy of the Legislature in enacting the statute.'" *Id.* (quoting *Johnson v. State*, 467 Md. 362, 372 (2020)).

MCC Section 19-35(e) contains the provisions for WQPC credit eligibility:

(e)(1) A property owner may apply for, and the Director of Environmental Protection must grant, a credit equal to a percentage, set by regulation, of the [WQPC] if:
> (A) the property contains a stormwater management system for which the County does not perform structural maintenance that either treats on-site drainage only or both on-site drainage and off-site drainage from other properties located within the same drainage area;

. . .

(2) To receive the credit, the property owner must apply to the Director of Environmental Protection in a form prescribed by the Director not later than September 30 of the year that payment of the [WQPC] is due. Any credit granted under this subsection is valid for 3 years.

MCC Section 19-21 defines "stormwater management" as "[t]he collection, conveyance, storage, treatment, and control of stormwater as needed to reduce accelerated stream channel erosion, increased flood damages, or water pollution." Section 19-21 further defines "stormwater management system" as "[n]atural areas, environmental site design practices, stormwater management measures, and any structure through which stormwater flows, infiltrates, or discharges from a site." The MCC does not provide a definition for "stormwater management measure," but Section 19-22A ("Stormwater management measures") provides the management techniques that meet the requirements for compliance with Section 19-24. *See* MCC § 19-24(a)(1) ("A person that receives a sediment control permit must provide on-site stormwater management unless the Director waives this requirement."). Section 19-22A(b)(1) states that "[a]n applicant must apply

55

the following [ESD] planning techniques according to the Design Manual to satisfy the on-site stormwater management requirements of Section 19-24." The same "according to the Design Manual" language is used in Section 19-22A(c)(1) for structural stormater management practices.

Reading the plain language of these sections of the MCC, we conclude that absolute compliance with the Design Manual is not required for WQPC credit. Although the County argues that it "strains credulity to suggest" that the County Council created a stormwater management scheme premised on the Design Manual yet "intended to award credits for structures and practices expressly not in conformance with the Stormwater Management Article and the Design Manual," MCC Section 19-35(e) itself does not provide any requirements that practices eligible for credit must conform to the Design Manual. Even read within the overall scheme for stormwater management, Section 19-22A's "according to the Design Manual" language refers to meeting the requirements of Section 19-24, not qualifying for WQPC credit under 19-35(e). Repeated reference to the Design Manual throughout the MCC is not synonymous with requiring strict compliance with its designs in order to be granted WQPC credit when such compliance is not explicit in Section 19-53(e).[26]

_____

[26] For similar reasons, the County's argument that State regulation requires compliance with the Design Manual is unavailing. The various references to the Design Manual in the stormwater section of COMAR refer to complying with minimum control requirements, not potential eligibility for credit against a stormwater charge like the WQPC. COMAR §§ 26.17.02.05–08.

56

The County's WQPC Credit Procedures Manual[27] furthers this point. It states that

for non-residential credit, "[s]tormwater management system practices *are generally based*

*on* [MDE's] recognized practices as specified in the [Design Manual] and any additional

practices recognized by the [Montgomery County Department of Permitting Services]."

Montgomery Cnty. Dep't of Env't Prot., Water Quality Protection Charge Procedures

Manual 3-1 (2018) [hereinafter Procedures Manual] (emphasis added). This is a far cry

from *requiring* that stormwater management accord with the Design Manual in order to

obtain WQPC credit. *See also* COMAR § 26.17.02.02(9) (defining "Design Manual" as

"the 2000 Maryland Stormwater Design Manual, Volumes I & II, that serves as the official

*guide* for stormwater management principles, methods, and practices" (emphasis

added)).[28]

---

[27] We note that the Procedures Manual cited to by the County is a version that was updated in November 2018, *i.e.*, after Porto requested WQPC exemption or credit. The prior version is not in the record, nor was the Court successful in locating it independently as a document incorporated by reference into COMCOR Section 19.35.01.05B. Regardless, the current version indicates that the Design Manual is not the sole means by which WQPC credit can be awarded.

[28] The County also argues that the WQPC credit scheme is premised on the County's own obligations under its MS4 permit and that it should not be required to grant credits for practices that it would not be able to claim towards its MS4 requirements. However, the County has not offered any indication that Porto's practices would not be acceptable under the County's MS4 permit other than what we have already addressed regarding State and County law. Indeed, the Montgomery County MS4 permit states in its stormwater management section that the County shall maintain a stormwater management program in accordance with the Stormwater Management Article of the Maryland Code and "[a]ctivities to be undertaken by the County shall include, *but not be limited to . . .* [i]mplementing the stormwater management design policies, principles, and practices found in the [Design Manual]." Montgomery County MS4 Permit MD0068349 Part IV.D.1 (emphasis added).

The County also argues that the Tax Court improperly conflated the requirements for erosion and sediment control with those for stormwater management. The County asserts that these are two distinct areas of law with different goals and that erosion and sediment control practices do not meet the requirements of its stormwater management laws. Further, the County contends that allowing WQPC credit for sediment and erosion control practices would swallow the rule and allow any property with sediment and erosion control to claim WQPC credit. Porto responds that the County's Stormwater Management and Erosion and Sediment Control Articles contain overlapping purposes. Porto also points to testimony from its expert witness stating that "erosion control is a form of stormwater management."

MCC Section 19-1 contains the purpose and scope of the Erosion and Sediment Control Article:

> The purpose of this Chapter is to protect, maintain, and enhance the public health, safety, and general welfare by establishing minimum requirements and procedures to control the adverse impacts associated with land disturbances. The goal is to minimize soil erosion and prevent off-site sedimentation by using soil erosion and sediment control practices designed in accordance with the applicable state law and regulations. Implementing this Chapter will help reduce the negative impacts of land development on water resources, maintain the chemical, physical, and biological integrity of streams, and minimize damage to public and private property.

The purpose and scope of the Stormwater Management Article reads:

> The purpose of this Article is to protect, maintain[,] and enhance the public health, safety, and general welfare by establishing minimum requirements and procedures to control the adverse impacts associated with increased stormwater runoff from developed and developing lands. The primary goal of the County is to maintain after development, as nearly as possible, the pre-development runoff characteristics, and to reduce stream channel erosion, pollution, siltation and sedimentation, and local flooding by implementing

environmental site design to the maximum extent practicable and using appropriate structural best management practices only when necessary.

MCC § 19-20.

Although the County is correct that the two articles are separate in the MCC which indicates a legislative intent that they are independent of one another, the Sediment and Erosion Control Article and the Stormwater Management Article are in the same overall chapter of the MCC, demonstrating a recognition that the two topics are related. Further, looking at these two sections in tandem, there is clear overlap between the County's goals and purposes for stormwater management and erosion and sediment control. Both address environmental concerns associated with land development, particularly those related to streams, and seek to prevent various forms of erosion. Given this overlap, it is plausible that certain practices could meet the goals and requirements of both Articles.[29] Contrary to the County's argument that allowing sediment and erosion control practices to receive WQPC credit "would create an exception to the WQPC so broad as to swallow it whole," this reading of the two Articles does not require that the County credit any and all sediment and erosion control practices as stormwater management. Those seeking WQPC credit

---

[29] The 2011 Maryland Standards and Specifications for Soil Erosion and Sediment Control, included in COMCOR Section 19.10.20.02.07 as a source for acceptable erosion and sediment control criteria, seems to envision the possibility that certain practices may fulfill both stormwater management and erosion and sediment control requirements. It states that "[s]tormwater management ponds may be used as sediment basins provided they meet the requirements of this section and that the construction sequence addresses converting the sediment basin to the permanent stormwater management pond." Water Mgmt. Admin, Md. Dep't of Env't, 2011 Maryland Standards and Specifications for Soil Erosion and Sediment Control G.19 (Dec. 2011).

still need to demonstrate acceptable stormwater treatment, including on a longer-term basis compared to the shorter lifespan of sediment and erosion control practices.

*2. Porto's Credit Eligibility*

We next turn to the Tax Court's conclusion that Porto is eligible for WQPC credit based upon its purported stormwater management systems. The County argues that because Porto's property contains only erosion and sediment control practices that do not meet the requirements of the Stormwater Management Article, it should not be awarded WQPC credit. Further, the County contends that the Tax Court improperly decided that Porto treats its stormwater in accordance with the Stormwater Management Article because Porto's expert testified only to reduced release rates and not treatment of stormwater. Porto responds that it is employing ESD and other stormwater management practices to the maximum extent practicable as required by County law and that its expert offered uncontroverted testimony of Porto's treatment of stormwater.

The Tax Court's findings on Porto's credit eligibility and award are factual findings that we review using the substantial evidence standard. *FC-GEN*, 482 Md. at 359. We defer to the factual findings and inferences that the Tax Court made so long as the record supports those findings and "whether a reasoning mind reasonably could have reached the [Tax Court's] factual conclusion." *Id.* (quoting *Frey*, 422 Md. at 137). We "trust the

60

agency's resolution of conflicting evidence and inferences drawn therefrom." *Id.* (cleaned up) (quoting *Broadway Servs.*, 478 Md. at 214–15).[30]

The Tax Court found that Porto "ha[d] demonstrated both onsite treatment of all of its stormwater and additional treatment of offsite stormwater" and therefore was entitled to a credit under MCC Section 19-35. The Tax Court based this finding upon uncontroverted testimony from Porto's engineering expert, who "prepared stormwater calculations which were included in the [WQPC] credit applications submitted to the [County]."

The record supports the Tax Court's conclusions. Each of Porto's applications and appeals to the County explained the stormwater management and treatment present on Porto's property. These applications described the berm, dry ponds, wet ponds, swales, and conservation landscaping present on and around Porto's property. Further, Porto wrote:

> Areas of the quarry floor also act as dry ponds because they are lower points on the property. Existing stockpiles of bulk mineral resources, mulch and other organic resources act in the same manner as infiltration trenches, sand mounds, and pervious pavers for which the County gives credit. As set forth below [in Porto's application], Porto increased the height of its stormwater management berm, at its own expense, to help the County meet the goals of the Critical Area Impact Study during the Seven Locks Road Approaches and Bridge Replacement project years ago. The berm has managed stormwater both on-site and off-site far beyond the drainage for which it should be responsible. Stormwater control and maintenance on Porto's property is routine and long-standing.

---

[30] To be clear, we are not affording the Tax Court deference beyond this trust in the Tax Court's resolution of conflicting evidence and findings of fact as supported by the record. *FC-GEN*, 482 Md. at 359; *see id.* at 378 ("Although the Tax Court may have expertise in tax laws, it does not undertake the regulatory or administrative functions that provide the basis for deferential review.").

(Footnotes omitted.) Porto's applications were supported by photos of its purported stormwater management and diagrams produced by engineers that depicted the property's drainage area and berm.

Porto's engineering expert, Mr. Ernest, elaborated on the property's stormwater management in testimony before the Tax Court. He described that the berm utilizes filter fabric and gravel to filter and slow water as it builds behind the berm. Mr. Ernest also described two maps he developed for Porto that depict the drainage area of the Porto property, discuss various points of study on the property and how much of the drainage is treated by each point, and contain general notes about how much impervious area is present. He then explained the basic methods he used to calculate how much storage and treatment Porto's property provides through its sediment traps, after which Porto's attorney asked: "And briefly, does that basically mean in layman's terms that so far the Portos are controlling 100 percent of their stormwater runoff entry?" Mr. Ernest responded:

> Yeah, yeah. To kind of do the correlation of a sediment trap is basically an excavated area, hole in the ground, has a permanent pool of water, a pond there. A stormwater pond is a hole in the ground that has a permanent pool of water, so they both have kind of the equivalent treatment mechanism of a permanent pool where the water comes in, it's going to settle out before it discharges from the site.

Mr. Ernest also explained that the quarry pit itself acts as a stormwater management mechanism:

> So all the water that actually hits the mine, or the quarry hole, doesn't really leave, so there's no real runoff from the site itself unless Porto would do it through the operations. And my understanding [is] that they use that water pretty environmentally sound because they use it to keep the dust down around their property, or they pump it up into the woods where it ultimately

62

drains to the sediment trap. So in a roundabout way it is being treated, but you know, for a one inch rainfall event this is a hundred foot deep hole, the water is never leaving it. So there would be technically zero runoff from it.

Mr. Ernest also testified that Porto treats off-site drainage and ultimately agreed that he had a reasonable degree of engineering certainty that Porto treats and controls 100% of its on-site drainage.

On cross-examination, Mr. Ernest explained his opinion that aspects of Porto's property treat and control stormwater:

> [T]he practice, design and (inaudible) control stormwater to reduce accelerated stream erosion, so . . . if those facilities [culverts on Porto's property] aren't there the water is going out at 9 [cubic feet] per second, with the pipes in place it's reducing it down to five, so that is reducing stream channel erosion. (Inaudible) in polluting the surface in stream channel erosion and pollution of surface waters. So the sediment traps on the south actually collect the water, they are designed to collect the water, have detention time where those pollutants will set abound [sic] every time before it leaves the property. So they are intentionally designed to control stormwater.

The expert further testified that, in looking at the Design Manual and in his professional engineering opinion, he

> would never put a bioretention . . . measure at one of these sites [that constantly changes] because they would fail and the property owner would be burdened by daily cleanups, daily replacing these things. So there's certain things that you say assess [sic] and make judg[]ments on that would apply.
>
> And when you look at a stormwater erosion control measure there are aspects that do equivalency. So you look at how are these volumetrics being achieved for the purpose in other permits that they relate to? So you look at that. Sediment trap has a wet pool, stormwater pond has a wet pool. So there's a lot of equivalencies in these, and for that reason I would say these are for their use that they have, an appropriate stormwater system.

The County did not offer any testimony or other evidence to contradict Mr. Ernest's calculations or conclusions regarding Porto's stormwater management, instead relying on the position that sediment and erosion control measures that do not strictly accord with the Design Manual cannot be the basis for WQPC credit.

Upon a review of the record, there was substantial evidence to support the Tax Court's finding that Porto demonstrated on-site treatment of both on- and off-site stormwater. Given the deference owed to the Tax Court's factual findings and inferences, we decline to disturb the Tax Court's conclusion that Porto treats on- and off-site stormwater and is therefore entitled to WQPC credit.

### 3. *Award of a 100% Credit*

The County further argues that the Tax Court improperly awarded Porto a 100% credit, claiming that the Tax Court lacked an adequate factual basis to support such an award. Specifically, the County contends that County law and the Design Manual require extensive calculations before WQPC credit can be awarded which the Tax Court did not demonstrate it had completed. Additionally, the County asserts that the Tax Court relied exclusively on the testimony of Porto's expert describing release rates and stormwater collection that are not synonymous with the stormwater treatment calculations required for determining WQPC credit. Porto argues that it presented sufficient evidence of treatment of on- and off-site stormwater, including Mr. Ernest's calculations of treatment volume. Porto avers that the County did not contest its expert's calculations and that the Tax Court appropriately relied upon the expert's testimony to conclude that Porto was entitled to a 100% credit.

The Tax Court's decision that Porto is entitled to a 100% credit is a mixed question of law and fact that requires an assessment of the County Code and associated regulations and the application of facts to those laws. As such, the decision would generally be subject to a more deferential standard of review to both its fact-finding and the application of law to those facts. *FC-GEN*, 482 Md. at 363. However, for reasons set forth more fully below, we conclude that the Tax Court did not properly apply the law to the facts and therefore we will not afford it deference. *Id.* at 364 ("[I]f the Tax Court's legal conclusions are wrong, a reviewing court may substitute the correct legal principles." (quoting *NCR Corp.*, 313 Md. at 134)).

The County promulgated regulations to guide the credit process under MCC Section 19-35. COMCOR § 19.35.01.05 ("Credits"). The relevant subsection, "Credit Awards," reads as follows:

(1) The Director [of DEP] must award a credit, not to exceed 60 percent, based on the proportion of the total volume of water treatment provided by the stormwater management system relative to the environmental site design storage volume required under State law as specified in the [Procedures Manual] published by the Director and incorporated by reference as if fully set forth. The volume of treatment required will be based on the environmental site design specified in the [Design Manual], as amended.

(2) A nonresidential or a multifamily residential property must be credited for treatment of off-site drainage from other properties located within the same drainage area as that property, not to exceed 100 percent of the Charge billed to the property owner, if the stormwater management system located on the nonresidential property or multifamily residential property treats the required on-site environmental site design storage volume while at the same time providing additional storage volume for off-site drainage. The total credit will be determined by applying the percent credit of off-site property to the impervious area of that off-site property and then adding that computation to the credit for the on-site

65

impervious area, not to exceed 100 percent of the total Charge billed to the property owner as specified in the [Procedures Manual].

. . .

(4) The Director must award a credit, not to exceed 80 percent, if the total volume of water treatment is provided by a stormwater management system that implements environmental site design to the maximum extent practicable.

COMCOR § 19.35.01.05B.

As the County regulation indicates, WQPC credit can only be awarded according to specific calculations and guidance contained in the Procedures Manual. These procedures also determine the percent of credit that can be awarded, including limitations on what percentage is available for certain practices. The Tax Court, however, simply concluded that Porto "ha[d] substantially complied with the requirements of the Montgomery County Regulations and [was] entitled to a 100% Water Quality Protection Charge credit." The Tax Court did not engage in any calculation or demonstration of how it reached the determination that Porto was entitled to a 100% credit. While the Tax Court's order referenced the calculations included in Porto's credit applications, those calculations are insufficient to show that Porto's practices meet the requirements of COMCOR Section 19.35.01.05B(2), which requires that the credit "be determined by applying the percent credit of off-site property to the impervious area of that off-site property and then adding that computation to the credit for the on-site impervious area."

An award of a 100% credit requires more than a determination that a site treats both on- and off-site stormwater. Instead, certain calculations are required to determine the "Offsite WQPC Percent Credit," which is then added to the calculation of credit for on-site treatment. Procedures Manual, at A-3-6–7. Further, the Procedures Manual requires that

66

an on-site WQPC credit of 60% must be granted before off-site credit can be awarded. *Id.* at A-3-6.

As the County notes, the credit percentage available also varies based upon the stormwater management system on a property. According to COMCOR Section 19.35.01.05B and explained in the Procedures Manual, "[w]hen the stormwater treatment achieved on the site is via environmental site design . . . practices exclusively, as defined according to the Maryland Stormwater Design Manual, property owners are eligible for up to 80% credit. Non ESD practices are eligible for up to 60% WQPC credit." Procedures Manual, at 3-1.

The Tax Court did not explain how it determined that Porto was entitled to a 100% credit against the WQPC, nor did it demonstrate that it utilized the calculations and procedures required by County law to reach its determination. The Tax Court relied exclusively on Porto's expert's calculations of drainage area and storage volume but did not engage in the calculations that the County would have to determine if the expert's calculations complied with the County's methods. The Tax Court also did not indicate which of Porto's stormwater management practices it classified as ESD practices or as structural practices. As a result, the Tax Court's order is insufficient to demonstrate that it applied County law correctly to the facts before it, and we affirm the remand of the case to

the Tax Court to conduct the calculations and inquiries required by County law to determine the credit percentage Porto is entitled to.[31]

### D. Attorneys' Fees

Finally, Porto asserts that the County has acted in bad faith during this litigation and thus believes it is entitled to attorneys' fees under Maryland Rule 1-341(a), which allows a court to order that a party who "maintain[s] or defend[s] any proceeding . . . in bad faith or without substantial justification . . . pay [] the adverse party the costs of the proceeding and the reasonable costs, including reasonable attorneys' fees, incurred by the adverse party in opposing it."  The County responds that none of the four exceptions to the American Rule in Maryland apply in this case.  Further, the County asserts that Porto's reliance on Rule 1-341 is indicative of the fact that there is insufficient support for a claim of attorneys' fees and that the parties have demonstrated material and genuine disagreements about the WQPC.

The Tax Court correctly stated that it was without statutory authority to award attorneys' fees to the prevailing party.  This is a position that the Tax Court has long maintained.  *See Lange v. State of Md. (Montgomery Cnty.)*, 1979 WL 1779, at *2 (Md. Tax Ct. Apr. 27, 1979) ("The simpl[e] answer to the Petitioner's request for attorney fees

---

[31] The County makes a passing argument that the case should be remanded to the DEP for the determination of what credit percentage Porto should receive against the WQPC.  This would not be proper under the Administrative Procedure Act's judicial review provisions, which allows a final order from the Tax Court to be remanded for further proceedings before the Tax Court.  Md. Code (2014, 2021 Repl. Vol.), State Gov't § 10-222(h)(1); *see Atlantic Venture, Inc. v. Supervisor of Assessments of Balt. City*, 94 Md. App. 73, 84 (1992) (holding that the Tax Court is the administrative agency that hears remands for assessment evaluations, not the Supervisor of Assessments).

is that this Court has no jurisdiction over such a request."); *Edwards Fam. Ltd. P'ship v. Gault*, 1985 WL 6280, at \*5 (Md. Tax Ct. July 3, 1985) ("[W]e note that this agency is without the authority to award costs or attorneys' fees."). Nothing in Title 3 of the General Tax Article of the Maryland Code (1988, 2022 Repl. Vol.), which governs the Tax Court, grants the Tax Court the ability to award attorneys' fees.

Porto's reliance on Rule 1-341 is misplaced. Maryland Rule 1-101(a) ("Applicability") states: "Title 1 applies to all matters in all courts of this State, except the Orphans' Courts and except as otherwise specifically provided." As previously mentioned, "[d]espite its name, *the Tax Court is not a court*; instead, it is an adjudicatory administrative agency in the executive branch of state government." *FC-GEN*, 482 Md. at 365 (emphasis added) (quoting *Furnitureland S., Inc. v. Comptroller*, 364 Md. 126, 137 n.8 (2001)). Thus, without specific statutory authority or express provision in the Rule itself, Rule 1-341 does not extend to the Tax Court. *See Montgomery Cnty. v. Supervisor of Assessments of Montgomery Cnty.*, 275 Md. 58, 62 n.4 (1975) ("Appellees' reliance upon [Rule 208] is misplaced since the Maryland Rules do not govern procedures before the Tax Court."); *see also Maizel v. Comptroller*, 250 Md. App. 360, 383 (2021) ("We conclude that Maryland Rule 2-402 does not apply to proceedings in the Tax Court . . . ."); *Comptroller v. Myers*, 251 Md. App. 213, 242–43 (2021) (concluding that Maryland Rule 2-501 is inapplicable to the Tax Court because although Tax Court proceedings "shall be conducted in a matter similar to" circuit courts, "similar . . . does not mean identical").

In this case, the circuit court affirmed the decision of the Tax Court to not award attorneys' fees. It is unclear from Porto's memorandum of law to the circuit court whether

69

it was requesting that the circuit court reverse the Tax Court on the attorneys' fees issue or whether it was asking the circuit court to award attorneys' fees itself. Either way, attorneys' fees are not available in this case. For the reasons explained above, the Tax Court does not have authority to award attorneys' fees, so the circuit court did not err in affirming the Tax Court's denial of fees. The circuit court does not have authority to award attorneys' fees itself because such awards are not available for administrative appeals brought pursuant to the Maryland Administrative Procedure Act, Md. Code (2014, 2021 Repl. Vol.), State Gov't § 10-222. *Campbell*, 364 Md. at 124 (holding that State Government Section 10-222(h) does not authorize a reviewing court to award attorneys' fees in administrative appeals); Md. Code, Gen. Tax § 13-532(a)(1) ("A final order of the Tax Court is subject to judicial review as provided for contested cases in §§ 10-222 and 10-223 of the State Government Article.").

## CONCLUSION

To summarize, we hold that Montgomery County's WQPC is a valid excise tax within the County's taxing authority, not a regulatory fee or property tax. As such, the WQPC is not preempted by State regulation of mines. We further conclude that Montgomery County must comply with the requirements of EN Section 4-204 in implementing the WQPC and that the County is abiding by those requirements in this case. Additionally, we hold that based upon the statutory context, EN Section 4-202.1(e)(2) does not exempt *any* entity with a NPDES permit from stormwater remediation charges, only State government entities with NPDES permits. We also hold that the MCC does not require strict compliance with the Design Manual for WQPC credit eligibility and thus that

70

Porto is eligible for WQPC credit based upon the Tax Court's factual findings about Porto's treatment of stormwater, which are supported by substantial evidence in the record. However, we agree with the circuit court that the Tax Court's order did not demonstrate that it applied the relevant County law in concluding that Porto was entitled to a 100% credit against the WQPC. Finally, we conclude that attorneys' fees are not available in this case. Accordingly, we affirm the order of the circuit court in all respects, including that remand to the Tax Court is warranted to demonstrate on the record how the WQPC credit award was calculated according to County law.

**JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AFFIRMED. CASE REMANDED TO THE CIRCUIT COURT FOR MONTGOMERY COUNTY FOR FURTHER REMAND TO THE MARYLAND TAX COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID THREE-FOURTHS BY APPELLANT AND ONE-FOURTH BY APPELLEE.**